**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| NUCOR CORPORATION,<br><br>     **Plaintiff,**<br><br>  **and**<br><br>STEEL DYNAMICS, INC.,<br><br>     **Plaintiff-Intervenor,**<br><br>  v.<br><br>UNITED STATES,<br><br>     **Defendant,**<br><br>  **and**<br><br>HYUNDAI STEEL COMPANY and<br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>     **Defendant-Intervenors.** |

Before:  Hon. Jennifer Choe-Groves,
     Judge

Court No. 22-00050

## ORDER

Upon consideration of Plaintiff Nucor Corporation's ("Nucor") Rule 56.2 motion for judgment on the agency record, and all other pertinent papers and proceedings herein, it is hereby

**ORDERED**, that Nucor's motion for judgment on the agency record is granted; and it is further

**ORDERED**, that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED**.

           _____
            Hon. Jennifer Choe-Groves, Judge

Dated: _____, 2022
   New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| NUCOR CORPORATION, |
|                 **Plaintiff,** |
|   **and** |
| STEEL DYNAMICS, INC., |
|                 **Plaintiff-Intervenor,** |
|   **v.** |
| UNITED STATES, |
|                 **Defendant,** |
|   **and** |
| HYUNDAI STEEL COMPANY and GOVERNMENT OF THE REPUBLIC OF KOREA, |
|                 **Defendant-Intervenors.** |

Before:  Hon. Jennifer Choe-Groves, Judge

Court No. 22-00050

**PLAINTIFF NUCOR CORPORATION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Nucor Corporation ("Nucor"), plaintiff in this action, hereby moves for judgment upon the agency record with respect to the final results in the administrative review of the countervailing duty order covering *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019), for the period of review of January 1, 2019 through December 31, 2019.  The final results were signed by the U.S. Department of Commerce ("Commerce") on January 12, 2022 and published in the *Federal Register* on January 19, 2022.  *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed.

Ct. No. 22-00050

Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019).

For the reasons explained in the brief accompanying this motion, Nucor respectfully submits that Commerce's findings, conclusions, and determination with respect to the final results are not supported by substantial evidence or otherwise not in accordance with law. Nucor further moves that the Court remand these results to Commerce to correct the errors consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: July 25, 2022

2

NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NUCOR CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>　　and<br><br>STEEL DYNAMICS, INC.,<br><br>　　　　　　Plaintiff-Intervenor,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　　Defendant,<br><br>　　and<br><br>HYUNDAI STEEL COMPANY and<br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>　　　　　　Defendant-Intervenors. | Before:  Hon. Jennifer Choe-Groves,<br>　　　　　Judge<br><br>Court No. 22-00050<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**Business Proprietary Information<br>Removed from Pages 16, 18, 20, 21,<br>and 23** |

## <u>PLAINTIFF NUCOR CORPORATION'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: July 25, 2022

Ct. No. 22-00050                                                   NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

                                                                                    Page

I.      INTRODUCTION ................................................................................................ 1

II.     RULE 56.2 STATEMENT ................................................................................... 1

        A.      Administrative Decision under Review ..................................................... 1

        B.      Issues Presented ........................................................................................ 1

III.    STATEMENT OF FACTS ................................................................................... 2

        A.      Legal Framework ...................................................................................... 2

        B.      Administrative Proceedings Below............................................................ 4

IV.     STANDARD OF REVIEW ............................................................................... 10

V.      ARGUMENT ..................................................................................................... 12

        A.      Commerce's Finding that the GOK Does Not Subsidize the Korean
                Steel Industry through the Provision of Electricity for LTAR Was
                Unlawful ................................................................................................... 12

                1.      Commerce Unlawfully Disregarded the Government Price to
                        the Respondents in Determining Whether a Benefit Exists.........14

        B.      Commerce's Finding that the GOK Does Not Subsidize the Korean
                Steel Industry through the Provision of Electricity for LTAR Was
                Unsupported by Substantial Evidence ................................................... 18

                1.      Record Evidence Demonstrates that the Korean Electricity
                        "Market" is Not Governed by Market Principles .......................19

                2.      Commerce Nevertheless Accepted Costs Tainted by the
                        GOK's Control of the Electricity Market ...................................21

                3.      The Government Prices to the Respondents Did Not Reflect
                        the Cost of Production Plus an Amount for Profit......................22

VI.     CONCLUSION.................................................................................................. 24

Ct. No. 22-00050                                       NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Asociacion Colombiana de Exportadores de Flores v. United States*,
   13 CIT 13, 704 F. Supp. 1114 (1989) ......................................................................11

*Asociacion Colombiana de Exportadores de Flores v. United States*,
   901 F.2d 1089 (Fed. Cir. 1990) ............................................................................11

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ............................................................................................11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
   28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ..........................................................11

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ..............................................................................11

*Micron Tech., Inc. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) ............................................................................10

*Mid Continent Nail Corp. v. United States*,
   846 F.3d 1364 (Fed. Cir. 2017) ............................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................11

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995) ..............................................................................11

*Nucor Corp. v. United States*,
   927 F.3d 1243 (Fed. Cir. 2019) .......................................................................3, 12

*SKF USA Inc. v. United States*,
   263 F.3d 1369 (Fed. Cir. 2001) ............................................................................12

*Target Corp. v. United States*,
   609 F.3d 1352 (Fed. Cir. 2010) ............................................................................11

*U.S. Steel Corp. v. United States*,
   33 CIT 1935 (2009) ............................................................................................17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................10

19 U.S.C. § 1677(5)(A) ............................................................................................2

19 U.S.C. § 1677(5)(B) ............................................................................................2

19 U.S.C. § 1677(5)(D)(iii) ......................................................................................2

19 U.S.C. § 1677(5)(E) .....................................................................................2, 4, 17

19 U.S.C. § 1677(5)(E)(iv) .......................................................................................2

19 U.S.C. § 1677f-1(e) ...........................................................................................12

**Regulations**

19 C.F.R. § 351.503(b)(1) .......................................................................................12

19 C.F.R. § 351.511(a)(2)(i) ................................................................................3, 13

19 C.F.R. § 351.511(a)(2)(ii) ...............................................................................3, 13

19 C.F.R. § 351.511(a)(2)(iii) ..................................................................................3

19 C.F.R. § 351.511(b) ..........................................................................................13

**Administrative Materials**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation,*
    81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ......................................13

*Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea
    and the People's Republic of China,* 81 Fed. Reg. 48,387 (Dep't Commerce
    July 25, 2016) .......................................................................................................5

*Certain Corrosion-Resistant Steel Products from the Republic of Korea. Certain
    Corrosion-Resistant Steel Products from the Republic of Korea,* 81 Fed. Reg.
    35,310 (Dep't Commerce June 2, 2016) ..............................................................4

*Certain Oil Country Tubular Goods from the Republic of Korea,*
    84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) .....................................20

*Certain Softwood Lumber Products from Canada,*
    66 Fed. Reg. 43,186 (Dep't Commerce Aug. 17, 2001) ......................................4

*Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of
    China,* 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) ........................13

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China,*
    73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ......................................17

*Coated Free Sheet Paper from Indonesia,*
  72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) ........................................13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*
  *from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce
  July 13, 2018)..................................................................................................24

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China,*
  73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) ........................................17

*Steel Concrete Reinforcing Bar from the Republic of Turkey,*
  82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) ........................................14

*Supercalendered Paper from Canada,*
  80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) ........................................14

**Other Authorities**

Redetermination Pursuant to Court Remand Order, *POSCO v. United States,*
  Consol. Ct. No. 17-00137 (Ct. Int'l Trade July 6, 2021)......................................2, 3, 4, 12, 22

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
  No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................4, 17

## I.  INTRODUCTION

On behalf of Plaintiff, Nucor Corporation ("Nucor"), we hereby submit the following brief in support of Nucor's Rule 56.2 Motion for Judgment on the Agency Record.

## II.  RULE 56.2 STATEMENT

### A.  Administrative Decision under Review

The administrative determination challenged herein is the U.S. Department of Commerce's ("Commerce") final results in the 2019 administrative review of the countervailing duty order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019), P.R. 216 ("*Final Results*").

### B.  Issues Presented

**1.  Whether Commerce's determination that the Government of Korea's provision of electricity for less than adequate remuneration conferred a non-measurable benefit was supported by substantial evidence or otherwise in accordance with law.**

No.  The *Final Results* are unsupported by substantial evidence and not in accordance with law because Commerce applied an unlawful methodology in determining whether a benefit was conferred by the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR"), and the record evidence clearly confirmed that a benefit was conferred. At bottom, Commerce determined that no benefit was conferred by the GOK's provision of electricity for LTAR because the state-owned electric utility, the Korea Electric Power Corporation ("KEPCO"), was able to recover its overall costs to all customers in the relevant tariff class, despite the fact that it did not recover costs and a rate of return on the lower rates it charged to the respondents.  *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022)

(final results and partial rescission of countervailing duty admin. rev.; 2019), P.R. 213 ("Final Decision Memo") at 15–19.  As Commerce has previously recognized, a benefit is conferred "if the tariff charged <u>to the respondent</u> does not cover 'cost of production' plus a 'profitable return on investment' . . . ."  Redetermination Pursuant to Court Remand Order, *POSCO v. United States*, Consol. Ct. No. 17-00137, at 30 (Ct. Int'l Trade July 6, 2021) ("*POSCO* Remand Results") (emphasis added).  Commerce's focus on the aggregate performance of the government supplier, rather than the prices actually paid by the respondents, was thus contrary to the agency's regulations, in addition to the statute and relevant judicial and agency precedents.  Furthermore, record evidence overwhelmingly showed that a benefit was conferred.

## III.   <u>STATEMENT OF FACTS</u>

### A.   <u>Legal Framework</u>

The statute defines a countervailable subsidy as "the case in which an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred," when the subsidy is "specific" to an industry or enterprise or group thereof.  19 U.S.C. § 1677(5)(A)–(B).  A "financial contribution" includes an authority "providing goods or services, other than general infrastructure," *id.* § 1677(5)(D)(iii), in which case a benefit is conferred "if such goods or services are provided for less than adequate remuneration," *id.* § 1677(5)(E)(iv).  The statute provides that Commerce should determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation," including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.* § 1677(5)(E).

Commerce's regulations establish a three-tier hierarchy for analyzing the adequacy of remuneration.  First, Commerce "will normally seek to measure the adequacy of remuneration by

comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). If market-determined prices are unavailable in the country under consideration, Commerce applies a "tier-two" methodology that "seek{s} to measure the adequacy of remuneration by comparing the government price to a world market price" that "would be available to purchasers in the country in question." *Id.* § 351.511(a)(2)(ii). When no such world market prices are available, Commerce uses a "tier three" methodology that "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* § 351.511(a)(2)(iii).

The Federal Circuit has confirmed that Commerce's analysis, regardless of tier, must be directed at determining whether the government price reflects "the value of what is being sold." *Nucor Corp. v. United States*, 927 F.3d 1243, 1252–53 (Fed. Cir. 2019). Because each regulatory "tier" exists to implement the same statutory standard, the Court

> {saw} no sound basis for finding in {the tier-three rule} a meaning different from the common-sense one already written into the statute by Congress when the regulation was adopted. Indeed, that meaning fits the place of subparagraph (iii) in the regulatory provision as specifying the residual method of implementing the statutory standard when the two primary methods are unavailable. <u>The above-stated meaning of "market principles" sensibly treats the three methods as all of a piece</u>, because the two primary methods of implementing the statutory standard rely on competitive-market prices, which, as {the statute} and our cases indicate, are tied to "fair value."

*Id.* at 1253 (emphasis added). To that end, Commerce has recently clarified that its tier-three inquiry asks whether the government price reflects "'cost recovery' plus 'a return on investment or profit.'" *POSCO* Remand Results at 27. "{I}f the tariff charged to the respondent does not cover 'cost of production' plus a 'profitable return on the investment,' . . . then the respondent has received a countervailable benefit under section 771(5)(E) of the {Tariff} Act {of 1930}." *Id.* at 30.

The focus of the adequacy of remuneration analysis, regardless of the regulatory "tier" under which it proceeds, is thus the government price "to the respondent." *Id.* Indeed, the "fundamental basis for identifying and measuring subsidies under U.S. {countervailing duty} practice" is that "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4240 ("SAA"). This has been expressly distinguished from benefit analyses based on the cost <u>to the government</u> of providing a subsidy. In *Softwood Lumber from Canada*, for example, Commerce explained that

> {f}rom the perspective of the recipient of the subsidy, the true measure of the benefit derived from any government largesse is by reference to what the recipient would have had to pay for the physical or financial good or service in the marketplace, absent any government involvement. <u>Thus, while one could argue that, from the government's perspective, remuneration could be considered "adequate" as long as it covers the costs to the government of providing the good or service, the cost-to-government standard is wholly inappropriate from the perspective of the private recipient</u>. This is because the cost to the government does not necessarily measure the price at which the private recipient could have obtained the good or service in the marketplace free of government interference.

*Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,193 (Dep't Commerce Aug. 17, 2001) (prelim. affirm. deter.) (emphasis added); *see also id.* (noting WTO recognition that "the authority must {likewise} 'determine whether the financial contribution places <u>the recipient</u> in a more advantageous position than would have been the case'" (emphasis added)).

This appeal addresses Commerce's application of the "tier-three" methodology to the Korean government's provision of electricity to certain Korean steel producers.

### B.    Administrative Proceedings Below

On June 2, 2016, Commerce published its final determination in the countervailing duty investigation of *Certain Corrosion-Resistant Steel Products from the Republic of Korea.  Certain*

*Corrosion-Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) (final affirm. deter., and final affirm. critical circumstances deter., in part). On July 25, 2016, Commerce published the countervailing duty order in the *Federal Register*. *Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China*, 81 Fed. Reg. 48,387 (Dep't Commerce July 25, 2016) (countervailing duty order). Commerce initiated the administrative review subject to this Complaint on September 9, 2020, covering the period of review ("POR") of January 1, 2019 to December 31, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 54,983 (Dep't Commerce Sept. 3, 2020), P.R. 9.

On January 4, 2021, Petitioners U.S. Steel Corporation ("U.S. Steel") and Nucor timely filed new subsidy allegations. Letter from Cassidy Levy Kent (USA) LLP and Wiley Rein LLP to Sec'y of Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Petitioners' New Subsidy Allegation* (Jan. 4, 2021), P.R. 96 ("Petitioners' New Subsidy Allegation"). In relevant part, Nucor and U.S. Steel alleged that the GOK provided countervailable subsidies to the steel industry in the form of electricity for LTAR. Commerce initiated a review of the alleged subsidy on February 1, 2021. Memorandum from Dennis McClure to Irene Darzenta Tzafolias, re: *Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: New Subsidy Allegation* (Feb. 1, 2021), P.R. 109.

Commerce issued supplemental questionnaires regarding the subsidy allegation to the GOK and to mandatory respondents Hyundai Steel Company ("Hyundai Steel") and KG Dongbu Steel Co., Ltd. ("Dongbu"), who provided responses on February 9, 2021 and February 23, 2021. Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's New Subsidy Allegations*

*Questionnaire Response* (Feb. 9, 2021) ("Dongbu NSA QR"), C.R. 212–217, P.R. 123; Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Hyundai Steel's New Subsidy Allegations Questionnaire Response* (Feb. 23, 2021) ("Hyundai Steel NSA QR"), C.R. 219–221, P.R. 129; Letter from Yoon & Yang LLC to Sec'y of Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New Subsidy Allegations Questionnaire Response* (Feb. 23, 2021) ("GOK NSA QR"), C.R. 222–227, P.R. 130.

In its initial questionnaire response, the GOK described the structure of the Korean electricity market and the operations of the state-owned electric utility, KEPCO. It explained that "KEPCO is the exclusive supplier of electricity in Korea," but that "KEPCO itself does not generate electricity." GOK NSA QR at 4. Instead, KEPCO "purchases electricity from generators" through a market called the Korea Power Exchange ("KPX") "and transmits and distributes {the electricity} to customers." *Id.* The GOK provided information showing that most electricity is generated by six generators that are wholly-owned and consolidated KEPCO subsidiaries, and that the KPX, in turn, is wholly owned by KEPCO and its six generation subsidiaries. *Id.* at 3–4, Exhibit E-1, p. 31. The GOK further explained that the price at which KEPCO purchases electricity from generators through the KPX is determined by a formula consisting of a variable cost component, a fixed cost component, and an "adjusted coefficient factor," which "prevent{s} KEPCO's over payment" to certain types of generators. *Id.* at 24–25. Each of these elements of the electricity price is determined by a "Cost Evaluation Committee" within the KPX and not by the generators themselves. *Id.*

The GOK also provided "KEPCO's 2019 cost data for supplying electricity." *Id.* at 13, Exhibit E-17. It explained that these costs "include{d} the payment for the purchase of electricity,

labor costs, grid maintenance fee" and various taxes and fees that were "not related to the sales of electricity . . . ." *Id.* With regard to sales prices, the GOK explained that the mandatory respondents paid for electricity based on industrial electricity prices in a generally applicable electricity tariff schedule with different prices for on-peak, mid-peak, and off-peak demand periods. *Id.* at 14, Exhibit E-9. The mandatory respondents reported the monthly volume and value of their electricity consumption during each of these demand periods. Hyundai Steel NSA QR at Exhibit NSA-2; Dongbu NSA QR at Exhibit NSA-2.

Commenting on the GOK's questionnaire responses, U.S. Steel pointed out that Commerce could not simply rely on the cost data provided by the GOK as representative of market-based costs. To begin with, KEPCO's cost data represented only KEPCO's cost of purchasing electricity from generators through the KPX market and did not reflect the actual costs of generating electricity. Letter from Cassidy Levy Kent (USA) LLP to Sec'y of Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Deficiency Comments Concerning the GOK's NSA SQR and Rebuttal Factual Information* (Mar. 16, 2021), C.R. 235, P.R. 141, at 3. Moreover, U.S. Steel noted that the largest electricity generation companies "are wholly owned subsidiaries of KEPCO and three of those {companies} were unprofitable during the POR." *Id.* at 4. As a result, "it is insufficient to only have data concerning KEPCO's acquisition costs because the {generation companies} are affiliates of KEPCO and did not receive sufficient return from sales to KEPCO to be profitable." *Id.* U.S. Steel also noted that each element of the formula on which KEPCO's acquisition price is based was assigned by the KPX Cost Evaluation Committee and not determined by the generators themselves. *Id.* at 11–12. U.S. Steel asked Commerce to collect additional information to address these and other related issues in the GOK's questionnaire responses. But Commerce elected not to collect additional information

regarding the actual costs of electricity generation or the cost assignments of the KPX Cost Evaluation Committee.

Commerce issued the preliminary results of the administrative review on July 12, 2021 and published them in the *Federal Register* on July 16, 2021.  Preliminary Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) (prelim. results of countervailing duty admin. rev., 2019), P.R. 173 ("Prelim. Memo").  Applying a "tier-three" benefit methodology, Commerce preliminarily determined that KEPCO supplied electricity to the mandatory respondents for LTAR under certain tariff classes, but it calculated a non-measurable benefit amount.  *Id.* at 32–37.

With respect to the price at which KEPCO purchased electricity through the KPX, Commerce reasoned that, in prior administrative reviews, it had "examined KPX, in the context of an upstream subsidy allegation," and found there was no benefit conferred by "KPX's prices of the {generation companies'} electricity to KEPCO . . . ."  *Id.* at 34.  It also found that "the GOK provided financial statements for the {generation companies}" and determined "that each of the six {generation companies} recovered its costs."  *Id.* at 35.  With respect to the prices at which KEPCO sold electricity to end users, including the respondents, Commerce "preliminarily determine{d} that KEPCO does have a pricing mechanism in place that is based on market principles, but also that the industrial rates did not always recover costs and a rate of return . . . ." *Id.* at 36.  For this analysis, Commerce relied on KEPCO's overall cost recovery rates and found that a benefit exists on sales under a specific tariff class to the extent that KEPCO did not cover its costs, inclusive of a return on investment, on sales to all customers in that tariff class.  *See, e.g.*, Memorandum from Josh Simonidis to The File, re: *Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results*

*Calculation Memorandum for Hyundai Steel Company* (July 12, 2021), C.R. 257–258, P.R. 174

("Hyundai Steel Prelim. Analysis Memo") at 4–5.

Nucor filed its case brief on August 26, 2021, arguing that Commerce's methodology for

determining the benefit conferred by the GOK's provision of electricity for LTAR was improper

and should be modified for the final determination.  Letter from Wiley Rein LLP to Sec'y of

Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Case Brief*

(Aug. 26, 2021), C.R. 264, P.R. 196.

As a threshold matter, Nucor noted the evidentiary flaws with the cost data on which

Commerce relied and argued that it was improper to presume that the data considered reflected

market-based costs.  *Id.* at 5–6.  Because the record was closed and Commerce had decided to rely

on KEPCO's cost data as reported by the GOK, however, Nucor demonstrated that this data

nevertheless showed that a benefit was conferred.  Additionally, Nucor highlighted that the tier-

three standard for electricity programs, as previously articulated by Commerce, is that a benefit is

conferred "if the tariff charged <u>to the respondent</u> does not cover 'cost of production' plus a

'profitable return on investment' . . . ."  *Id.* at 9 (quoting *POSCO* Remand Results at 30).

Consequently, Nucor argued that Commerce erred by finding that no benefit was conferred under

a particular tariff class when KEPCO covered its costs (inclusive of investment return) on <u>all</u> sales

to <u>all</u> customers in the aggregate.  *Id.* at 10–11.  Nucor argued that basing the benefit analysis on

the aggregate performance of the government supplier, rather than the prices actually paid by the

respondents under review, was contrary to the statute, Commerce regulations, and clearly

articulated court and agency precedents.  *Id.* at 11–12.

Commerce issued the final results on January 12, 2022 and published them in the *Federal*

*Register* on January 19, 2022.  *See generally* Final Decision Memo.  Commerce continued to

determine that the provision of electricity for LTAR conferred a non-measurable benefit based on KEPCO's costs and revenues in the aggregate under the relevant tariff classes. *Id.* at 15–19. Commerce reasoned that Nucor's arguments were "inapposite to a tier-three analysis," and that "an evaluation of a government supplier's income and costs and whether the income covers costs and profit . . . has consistently been part of our analysis when assessing whether KEPCO's pricing is consistent with market principles and has been found to be within the bounds of what {the regulation} proposes." *Id.* at 16. According to Commerce, its "tier-three methodology has been to first determine whether the prices are market-based. Where prices are set in accordance with market principles and, thus, are at fair value, we determine no benefit is conferred; where they are not market-based (*i.e.*, they have not recovered costs plus profit), we determine a price that would be market-based and compare that to what was actually paid using a benchmark." *Id.* at 18. Commerce determined that the KEPCO cost data as reported by the GOK reflected market prices because "the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit." *Id.*

Based in part on the determination that no measurable benefit was conferred by the provision of electricity for LTAR, Commerce calculated final subsidy rates of 0.47%, or *de minimis*, for Hyundai Steel and 10.51% for Dongbu. *Final Results*, 87 Fed. Reg. at 2,760. This appeal followed.

## IV.   <u>STANDARD OF REVIEW</u>

The Court "shall hold unlawful" Commerce's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *accord Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Substantial evidence is "more than a mere scintilla{;} {i}t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quotations omitted). "Speculation is not {substantial evidence in} support for a finding . . . ." *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 15, 704 F. Supp. 1114, 1117 (1989), *c̦f'd*, 901 F.2d 1089 (Fed. Cir. 1990). In determining whether Commerce's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {any evidence} which fairly detracts from {the} weight" of Commerce's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (quotation omitted). Moreover, for a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and Commerce's determination. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). If the Court finds that Commerce's determination was not supported by substantial evidence, it must remand the case to the agency for reconsideration.

Commerce also acts unlawfully where it abuses its discretion or acts arbitrarily. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors." *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014) (quotation omitted). And the obligation to avoid arbitrary action requires Commerce to engage in reasoned and evenhanded decision-making. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made." (quotation omitted)); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quotation omitted)).

## V.   <u>ARGUMENT</u>

### A.   <u>Commerce's Finding that the GOK Does Not Subsidize the Korean Steel Industry through the Provision of Electricity for LTAR Was Unlawful</u>

As noted above, under the tier three benefit regulation, "if the tariff <u>charged to the respondent</u> does not cover 'cost of production' plus a 'profitable return on the investment,' . . . then <u>the respondent</u> has received a countervailable benefit under section 771(5)(E) of the {Tariff} Act{of 1930}." *POSCO* Remand Results at 30 (emphasis added). Thus, as with tier one and tier two adequate remuneration analyses, Commerce must determine whether <u>the respondent</u> has received a benefit because the government's price to <u>the respondent</u> is for LTAR. Commerce may not, as the agency suggests, Final Decision Memo at 16, depart from this fundamental principle simply because it is conducting a tier three benefit analysis. *See Nucor*, 927 F.3d at 1253 (explaining that "{t}he above-stated meaning of 'market principles' sensibly treats the three methods as all of a piece . . . .").

The statute requires Commerce to "determine an <u>individual</u> countervailable subsidy rate for each known exporter or producer of the subject merchandise," or, if it is not practicable to do so, to "determine <u>individual</u> countervailable subsidy rates" for a representative selection of exporters or producers. 19 U.S.C. § 1677f-1(e) (emphasis added). The general rule regarding the benefit conferred by subsidies provides that "the Secretary normally will consider a benefit to be conferred where <u>a firm pays</u> less for its inputs . . . than it otherwise would pay . . . ." 19 C.F.R. § 351.503(b)(1) (emphasis added). Commerce's adequate remuneration rule provides that the agency should "consider a benefit as having been received as of the date on which <u>the firm</u> pays

or, in the absence of payment, was due to pay for the government-provided good or service." *Id.*
§ 351.511(b) (emphasis added). There is no dispute that "the government price" for the purpose
of tiers one and two refers to the government price paid by the respondent. *See id.*
§ 351.511(a)(2)(i)–(ii).

To this end, Commerce's countervailing duty questionnaire in LTAR investigations asks
respondents to report the volume and value of their company-specific input purchases, as it did for
electricity here. *See, e.g.*, Hyundai Steel NSA QR at 2. The agency uses this information to
determine whether a benefit has been conferred and to what extent. *See, e.g.*, Issues and Decision
Memorandum accompanying *Circular Welded Carbon Quality Steel Line Pipe from the People's
Republic of China*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) (final affirm.
countervailing duty deter.) at 20 ("We then compared the benchmark unit prices to the unit prices
the respondents paid to domestic suppliers of {hot-rolled steel} during the {period of
investigation} that {Commerce} determines constitute government authorities."); Issues and
Decision Memorandum accompanying *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg.
60,642 (Dep't Commerce Oct. 25, 2007) (final affirm. countervailing duty deter.) at 23
("{Commerce} has determined that using the . . . fees actually paid is more appropriate for
measuring the adequacy of remuneration. As such, we have summed the . . . fees actually paid by
the forestry companies . . . and compared this amount to the market-based stumpage fees the . . .
forestry companies should have paid during the {period of investigation}."); Issues and Decision
Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Russian
Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirm. countervailing
duty deter.) at 19 ("{W}e compared the corresponding monthly benchmark unit prices to the unit
prices that the NLMK companies paid Gazprom . . . during the {period of investigation}."); Issues

and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) (final affirm. countervailing duty deter.) at 12 ("{W}e compared the benchmark per-unit delivered price to the per-unit delivered price Habas actually paid BOTAS for natural gas during the {period of investigation}."); Issues and Decision Memorandum accompanying *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) (final affirm. countervailing duty deter.) at 48.

The statute, the regulation, and Commerce's practice thus confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to the government supplier for the input under consideration.  Beyond nebulous references to a purportedly "well-established" practice, Final Decision Memo at 15–16, 18–19, Commerce has articulated no legal or methodological justification for treating "the government price" in this case as the revenues earned by the Korean government supplier on all sales to all firms.

### 1.    Commerce Unlawfully Disregarded the Government Price to the Respondents in Determining Whether a Benefit Exists

Here, Commerce's analysis ignored the prices paid by the respondents to the government supplier in determining whether a benefit exists.  Instead, Commerce considered whether KEPCO covered its costs based on unit revenues on <u>all</u> sales to <u>all</u> consumers in the relevant tariff class. Commerce determined that the Korean government's provision of electricity conferred no benefit to relevant classes by first considering whether KEPCO's generation subsidiaries were profitable on their aggregate operations, including but not limited to electricity sales, and then considering KEPCO's unit revenues on all sales compared to its total unit costs, based on purchases through the KPX.  *See* Prelim. Memo at 32–37; *see also* Final Decision Memo at 17.  With respect to the generators, Commerce found that "the GOK provided financial statements for the {generators}" and, based on that information, "that each of the six {generators} recovered its costs."  Prelim.

Memo at 34–35; *see also* Final Decision Memo at 17–18.  With respect to KEPCO, Commerce

found that a benefit exists under a specific tariff rate only to the extent that KEPCO's total revenue

on sales to all customers under that tariff rate did not recover 100% of KEPCO's reported cost of

supply.  Prelim. Memo at 36; *see also* Final Decision Memo at 16–17 (upholding methodology

applied in the *Preliminary Results*).

      The agency's insistence that it is "required to assess the extent to which the price charged

by the government is consistent with market principles" is irrelevant to its actual analysis.  Final

Decision Memo at 16.  As the agency itself explains, it <u>did not</u> base its benefit determination on

"the price charged by the government," but on KEPCO's "income and costs and whether the

income covers costs and profit."  *Id.*  Here, the government prices for electricity were set forth in

KEPCO's electricity pricing schedule.  GOK NSA QR at Exhibit E-9.  The prices that the

respondents actually paid KEPCO for electricity pursuant to this pricing schedule were reported

in their respective NSA questionnaire responses.  Dongbu NSA QR at Exhibit NSA-2; Hyundai

Steel NSA QR at Exhibit NSA-2.  Each of these sources shows that KEPCO charged, and the

respondents paid, three different prices under each of the relevant electricity tariff classes – an

"off-peak" price, a "mid-peak" price, and an "on-peak" price.  GOK NSA QR at Exhibit E-9;

Dongbu NSA QR at Exhibit NSA-2; Hyundai Steel NSA QR at Exhibit NSA-2.

      The information that Commerce used to determine whether the respondents received a

benefit, however, was KEPCO's "cost by classification data," reflecting KEPCO's total cost of

sales and total sales income. Letter from Yoon & Yang LLC to Sec'y of Commerce, re: *Certain*

*Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New*

*Subsidy Allegations Supplemental Questionnaire Response* (Mar. 11, 2021), C.R. 236, P.R. 140

("GOK NSA SQR") at Exhibit E-17.1.  The "unit sales price" in this data, on which Commerce

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

based its analysis, reflects KEPCO's actual revenues on all sales to all customers under the respective tariff class.  It bears no resemblance to "the price charged by the government." Final Decision Memo at 16.

Dongbu, for example, reported purchasing electricity for steel production from KEPCO under the [                                                                              ].  *See* Dongbu NSA QR at Exhibit NSA-2.  KEPCO's pricing schedule lists seasonal prices for this tariff classification of (i) KRW 54.5/kWh to KRW 61.6/kWh for off-peak prices, (ii) KRW 76.90/kWh to KRW 106.8/kWh for mid-peak prices, and (iii) KRW 107.20/kWh to KRW 188.10/kWh for on-peak prices.  GOK NSA QR at Exhibit E-9.  These are [

             ] during the POR.  Dongbu NSA QR at Exhibit NSA-2.  Hyundai Steel likewise reported purchasing electricity for steel production [

                                    ].  *See* Hyundai Steel NSA QR at Exhibit NSA-2. The unit revenue at which Commerce determined that KEPCO covered its cost of supply under the [                                                                        ] tariff class, however, was [

         ].  *See* GOK NSA SQR at Exhibit E-17.1; Memorandum from Dennis McClure to Robert Palmer, re: *Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu)* (July 12, 2021), C.R. 260–261, P.R. 177 ("Dongbu Prelim. Analysis Memo") at 6.  This number appears nowhere in either KEPCO's price schedule or in the respondents' reported electricity purchase data because it is not "the price charged by the government."  It is, in fact, not a government price at all.  It reflects the government's total sales revenue and thus its overall financial performance for the respective tariff class.

Both Commerce and the courts have explained that the government supplier's overall financial performance is irrelevant to an adequate remuneration benchmark analysis.  In *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, for example, Commerce explained that "the profitability of Chinese {hot-rolled steel} producers is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR."  Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) (final affirm. countervailing duty deter. and final affirm. deter. of critical circumstances) at 65; *see also* Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) (final affirm. countervailing duty investigation deter.) at 36 ("{T}he profitability of SOE {hot-rolled steel} producers . . . is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR.").  This Court has likewise rejected arguments that an adequate remuneration analysis turns on the broader financial performance of the government supplier.  *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) ("The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.").

Determining whether a benefit exists based on the government supplier's revenue from sales to all customers rather than based on the prices actually paid by the respondents also contravenes the "fundamental basis for identifying and measuring subsidies under U.S. {countervailing duty} practice."  SAA at 927, 1994 U.S.C.C.A.N. at 4240.  Under the statute and Commerce's practice, "{a} benefit shall normally be treated as conferred where there is a benefit <u>to the recipient</u> . . . ."  19 U.S.C. § 1677(5)(E) (emphasis added).  That KEPCO may cover its costs plus a reasonable rate of return on all sales under a particular electricity tariff rate would mean only that there is no cost to the

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

GOK from providing the subsidy because it is able to recoup losses on sales to some customers with excess returns on sales to <u>other</u> customers.  Such a finding says nothing about the benefit to the recipient of the subsidy, the statutory focus of the inquiry.  Commerce's methodology gives governments *carte blanche* to engage in harmful cross-subsidization while depriving domestic industries of the relief to which they are entitled under the countervailing duty laws.

That is the result of Commerce's methodology here, and it is reflected in the benchmark prices that the agency calculated for those few tariff rates in which it did find that a benefit was conferred.  Comparing KEPCO's total unit revenues to its total unit costs, Commerce determined that a benefit existed under certain [          ] electricity rates because KEPCO's total cost recovery rate was [          ].  *See* Dongbu Prelim. Analysis Memo at 6; Hyundai Steel Prelim. Analysis Memo at 5.  Commerce then calculated a benchmark price by adjusting the prices that the respondents actually paid by the amount of the shortfall in KEPCO's overall cost recovery.  *See* Dongbu Prelim. Analysis Memo at 6; Hyundai Steel Prelim. Analysis Memo at 5.  The outcome was benchmark prices ranging from [                              ], or [

   ] <u>less than</u> KEPCO's cost of supply for the relevant tariff class.  *See* GOK NSA SQR at Exhibit E-17.1; Dongbu Prelim. Analysis Memo at Attachment IV ([                    ] tab); Hyundai Steel Prelim. Analysis Memo at Attachment II ([                    ] tab).  This is an absurd outcome that unlawfully washes away benefits to a respondent based on government revenues on sales to users and industries that are not under consideration in the proceeding.

### B.   <u>Commerce's Finding that the GOK Does Not Subsidize the Korean Steel Industry through the Provision of Electricity for LTAR Was Unsupported by Substantial Evidence</u>

Even under Commerce's reading of the tier three methodology, the inquiry at least asks whether government prices are in line with market principles.  *See* Final Results at 15, 19.  If yes,

then Commerce determines no benefit is conferred.  *See id.* at 15.  If no, then Commerce "determine{s} a benchmark that would be in line with market principles (*i.e.*, a price that covers costs plus a rate of recovery or profit), with the difference between the price paid and the benchmark being the benefit conferred." *Id.*  Here, in finding that some electricity prices were in line with market principles and thus conferred no benefit, Commerce accepted pricing data from the GOK and <u>assumed</u> those data were representative of market prices.  Based on the structure of the Korean electricity "market," however, that assumption was not supported by record evidence.

### 1.   Record Evidence Demonstrates that the Korean Electricity "Market" is Not Governed by Market Principles

Government control over energy markets, and over the electricity market in particular, has been a key element of GOK policy to support the international competitiveness of key industries like steel.  The Korean economy is one of the world's most energy intensive, despite relying overwhelmingly on imports of energy resources.  The Korean industrial sector accounts for around 55% of total energy consumption, the highest of any International Energy Agency ("IEA") country.  Petitioners' New Subsidy Allegation at Exhibit 1.  *See also id.* at Exhibit 2 ("South Korea's energy-intensive industrial sector, mostly steel and petrochemical production, drives the country's electricity consumption.").  Even though approximately 85% of total Korean energy resources are imported, Korean industrial electricity prices are lower than the IEA median, with low volatility.  *Id.* at Exhibit 1.  This would be impossible without the GOK's strict control over both retail and wholesale prices.  *See id.* at Exhibit 4 ("{W}holesale electricity trading prices are not determined through supply and demand . . . ."), Exhibit 3, p. 5 (explaining that KEPCO may not change its electricity prices to account for cost fluctuations).

The electricity "market" in Korea is a government-owned, -operated, and -directed monopoly.  Although the Korean electricity market is divided between a wholesale and retail

market, the GOK owns and controls the primary entities in both markets.  Indeed, the GOK does

not just regulate an otherwise market-oriented electricity market.  Rather, the GOK has established

a government-controlled monopoly in the Korean electricity market through KEPCO, whose six

wholly-owned subsidiary generators generate over [     ] of the electricity in Korea, and through

KPX, which is wholly-owned by KEPCO and its generation subsidiaries, and which operates the

only channel through which electricity may be sold.  GOK NSA QR at 3–5.

KEPCO transmits or distributes [     ] of electricity in Korea.  *Id.* at 5.  Consequently,

Commerce has previously explained that "{t}he GOK has tight control over the electricity market,

including supply and pricing" and "electricity in Korea functions as a tool of the government's

industrial policy."  *See* Issues and Decision Memorandum accompanying *Certain Oil Country

Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019)

(final results of antidumping duty admin. rev.; 2016–2017) at 25.  Moreover, because steel

manufacturers comprise some of the country's largest electricity consumers, they "serve as

principal beneficiaries of the Korean government's involvement in the market."  *Id.* at 29.

KEPCO admits that the GOK:

> {E}ffectively controls us as the supervisor and regulator in a heavily regulated
> industry, and in effect also exercises the same degree of control over our generation
> subsidiaries through our sole share ownership over our generation subsidiaries as
> well as its statutory power of direct appointment of the governing bodies of our
> generation subsidiaries.  In effect, we are acting as an intermediate holding company
> in a vertical control structure involving the Government, us and our generation
> subsidiaries, where the Government holds the ultimate control over both us and our
> generation subsidiaries and exercises its control over our generation subsidiaries in
> part through us acting as the sole shareholder and the parent company.

GOK NSA QR at Exhibit E-1, p. 171 (PDF 224) (emphasis added).

The GOK's control over KEPCO permeates every aspect of their business.  KEPCO admits

that the GOK "exercises substantial control over our budgeting and other financial and operating

BUSINESS PROPRIETARY INFORMATION<br>HAS BEEN DELETED

decisions," *id.* at Exhibit E-1, p. 55 (PDF 108), and supervises "the appointment of {KEPCO's} directors and our other senior management as well as approval of electricity tariff rate adjustments . . . ," *id.* at Exhibit E-1, p. 77 (PDF 130).  To be clear, KEPCO and its subsidiaries do not set their own prices as independent companies.  Although KEPCO and its subsidiaries may submit proposed rates charged for the electricity they sell, the GOK "makes the final decision." *Id.* at Exhibit E-2, p. 55 (PDF 612); *see also id.* at Exhibit E-2, p. 81 (PDF 638) ("{O}ur business is heavily regulated by the Government, including with respect to the rates we charge to customers for the electricity we sell.").  And KEPCO confirms that the GOK's control over its pricing limits its ability to pass on fuel and other cost increases to its customers, *id.* at Exhibit E-1, p. 5 (PDF 58) ("Because the Government regulates the rates we charge for the electricity we sell to our customers . . . , our ability to pass on fuel and other cost increases to our customers is limited. . . . The Government may also set or adjust electricity tariff rates that may not be necessarily responsive to fuel price movements.").

### 2.   Commerce Nevertheless Accepted Costs Tainted by the GOK's Control of the Electricity Market

Unsurprisingly, the GOK's control of the electricity "market" directly impacted the inputs used in Commerce's calculations.  In its new subsidy allegation questionnaire response, the GOK reported KEPCO's cost data for the POR.  GOK NSA QR at Exhibit E-17.  This dataset was based on  KEPCO's  [

], as discussed above.  *See id.* at Exhibit E-17 ([                                   ] tab).

According to that data, the price that KEPCO pays to purchase electricity through the KPX consists of (i) the "system marginal price," which is intended to represent the variable cost of electricity generation; (ii) the "capacity price," which is intended to represent the fixed costs of

generating electricity; and (iii) the "adjusted coefficient factor," which is theoretically tied to varying fuel costs but operates in practice as an *ad hoc* reallocation of revenue based on the financial performance of KEPCO and individual generators at the time that it is established. *Id.* at 25–26; *see also* GOK NSA SQR at 10. The values for each element of this formula are determined by the KPX via the Cost Evaluation Committee, and not by the generators themselves. GOK NSA QR at 24. The cost data that the GOK provided thus does not reflect the actual costs of electricity generation and supply, and any presumption that it does is unsupported. Commerce nevertheless treated the GOK's reported data as representative of market principles and did not collect information regarding the actual cost of generation and supply from the generators themselves.

In its final determination, Commerce defended its presumption that the GOK's self-reported cost data reflect market principles on the grounds that (1) "KEPCO is obligated to pay {the generators} for the total cost of generating electricity . . . even if KEPCO is not profitable," and (2) Commerce's "<u>prior</u> analysis of the prices paid by KEPCO through KPX have determined that they are inclusive of a rate of return, as well as the costs associated with generation." Final Decision Memo at 17 (emphasis added). But neither of these cursory explanations addresses, much less refutes, the overwhelming record evidence to the contrary. Because substantial evidence contradicts Commerce's assumption that the GOK's reported cost data reflect market principles, Commerce's determination that "some electricity prices were in line with market principles," *see id.* at 15, should be remanded.

### 3.    The Government Prices to the Respondents Did Not Reflect the Cost of Production Plus an Amount for Profit

Even based on KEPCO's reported cost of supply, which is distorted by government interventions throughout the supply chain, the respondents reported electricity prices "{did} not cover 'cost of production' plus a 'profitable return on the investment' . . . ." *POSCO* Remand

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Results at 30.  As noted above, both Dongbu and Hyundai Steel reported paying three different prices for electricity during the POR – an "off-peak" price, a "mid-peak" price, and an "on-peak" price.  Dongbu NSA QR at Exhibit NSA-2; Hyundai Steel NSA QR at Exhibit NSA-2.  Both respondents reported paying [

] KEPCO's reported cost of supply for the relevant tariff class.

Dongbu, for example, reported that its [            ] paid monthly off-peak prices under the [                        ] electricity rate class of [

].  Dongbu NSA QR at Exhibit NSA-2.  Dongbu also reported that the [

] paid mid-peak prices of [                ] in [                    ] during the POR.

*Id.*  Dongbu reported [                        ].  *Id.*  KEPCO's reported cost of supply for this electricity rate class was [                ].  GOK NSA SQR at Exhibit E-17.1.  Hyundai Steel reported that its [            ] paid monthly off-peak prices under the [

] electricity rate class of [                            ].  Hyundai Steel NSA QR at Exhibit NSA-2.  Hyundai Steel also reported that its [            ] paid mid-peak prices of [                ] in [                    ] during the POR.  *Id.*  KEPCO's reported cost of supply for this electricity rate class was [                ].  GOK NSA SQR at Exhibit E-17.1.

Both respondents reported paying electricity prices that are [

], meaning that KEPCO has structured its electricity prices to maintain subsidies to large industrial users like steel producers, while recouping losses on those sales through higher prices to other users.  *See, e.g.*, Petitioners' New Subsidy Allegation at Exhibit 13 (noting KEPCO's "overnight discounts offered to industrial customers").  Basing the analysis on KEPCO's total revenues on all sales to all customers effectively launders the benefit conferred

by subsidized prices by offsetting them with revenues on sales at non-subsidized prices to other consumers. *See, e.g.*, Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce July 13, 2018) (final results of countervailing duty admin. rev.; 2015) at 45–46 ("In a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit from certain transactions cannot be masked by 'negative benefits' from other transactions.").

Commerce's determination that the prices charged to the respondents were consistent with market principles is unsupported by record and should be remanded for reconsideration.

## VI.   <u>CONCLUSION</u>

Because Commerce's *Final Results* are in violation of Commerce's statutory obligations and practice, the *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.  Nucor thus respectfully requests this Court remand the final results to Commerce with instructions to correct the errors in calculation.

*/s/ Alan H. Price*

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: July 25, 2022

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,584 words.

*/s/ Alan H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

July 25, 2022
(Date)