**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| NUCOR CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and, | ) |
| | ) |
| HYUNDAI STEEL COMPANY and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) |
| | ) |
| Defendant-Intervenors. | ) |

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Pages 4-6

Court No. 22-00050

**DEFENDANT-INTERVENOR HYUNDAI STEEL'S BRIEF IN RESPONSE TO**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

October 7, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Defendant-Intervenor Hyundai Steel Company*

**TABLE OF CONTENTS**

I.      RULE 56.2 STATEMENT ....................................................................................... 2

        A.      Administrative Decision under Review ................................................... 2

        B.      Issues of Law Presented ........................................................................ 2

II.     STATEMENT OF FACTS .................................................................................... 2

III.    STANDARD OF REVIEW .................................................................................. 7

IV.     SUMMARY OF ARGUMENT ............................................................................ 7

V.      ARGUMENT ....................................................................................................... 9

        A.      Commerce's Determination That The GOK Does Not Subsidize The Korean Steel Industry
                Through The Provision Of Electricity For LTAR Was Lawful ............................................ 11

        B.      Commerce's Determination That The GOK Does Not Subsidize The Korean Steel Industry
                Through The Provision Of Electricity For LTAR Is Supported By Substantial Evidence.... 19

VI.     CONCLUSION ................................................................................................... 23

CERTIFICATE OF COMPLIANCE ................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Carpenter Tech. Corp. v. United States,*
    31 C.I.T. 181 (Ct. Int'l Trade 2007) ................................................... 12

*Hyster Co. v. United States,*
    18 C.I.T. 589 (Ct. Int'l Trade 1994) ................................................... 21

*Maverick Tube Corp. v. United States,*
    273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017)....................................... 18

*Mittal Canada Inc. v. United States,*
    30 C.I.T. 1565 (Ct. Int'l Trade 2006) ................................................. 12

*Ningbo Dafa Chem. Fiber Co., Ltd. v. United States,*
    580 F. 3d 1247 (Fed. Cir. 2009) ......................................................... 21

*Nucor Corp. v. United States,*
    286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018)....................................... 17

*Nucor Corp. v. United States,*
    927 F.3d 1243 (Fed. Cir. 2019)................................... 11, 13, 16, 19, 20

*POSCO v. United States,*
    977 F.3d 1369 (Fed. Cir. 2020)................................................... 11, 19

*Samsung Elecs. Co., Ltd. v. United States,*
    973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ...................................... 12

*Timken Co. v. United States,*
    179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ................................ 21, 22

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) .............................................................. 12, 19

*Torrington Co. v. United States,*
    156 F.3d 1361 (Fed. Cir. 1998) ................................................. 12, 19

*U.S. Steel Corp. v. United States,*
    33 C.I.T. 1935 (2009)........................................................................ 17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................... 7

19 U.S.C. § 1677(5)(A)-(E) ...................................................................... 9

19 U.S.C. § 1677f-1(e) ............................................................................................ 14

**Regulations**

19 C.F.R. § 351.309(d) ............................................................................................... 1

19 C.F.R. § 351.503(b)(1) ....................................................................................... 14

19 C.F.R. § 351.511(a)(2)(ii) .................................................................................. 10

19 C.F.R. § 351.511(a)(2)(iii) ....................................................................... 10, 11, 19

19 C.F.R. § 351.511(b) ........................................................................................... 14

**Other Authorities**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea,
    Final Results and Partial Rescission of Countervailing Duty Administrative
    Review, 2018,* 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) ............................... 6, 7

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:
    Preliminary Results of Countervailing Duty Administrative Review; 2019,*
    86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) ..................................... 4, 5, 6

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China,
    Final Affirmative Countervailing Duty Determination and Final Affirmative
    Determination of Critical Circumstances,* 73 Fed. Reg. 31,966 (Dep't
    Commerce June 5, 2008) .................................................................................... 16

*Circular Welded Carbon Quality Steel Line Pipe from the People's Republic
    of China: Final Affirmative Countervailing Duty Determination,*
    73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) ...................................... 15

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products
    From the Republic of Korea: Final Affirmative Determination, and Final
    Affirmative Critical Circumstances Determination, in Part,* 81 Fed. Reg.
    35,310 (Dep't Commerce June 2, 2016) ............................................................. 17

*Countervailing Duties,*
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ............................ 10, 11, 20

Final Results of Remand Redetermination Pursuant To Court Remand, *POSCO v.
United States*, No. 16-00225 (Ct. Int'l Trade Apr. 19, 2021), ECF No. 135-1 ...................... 5

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    85 Fed. Reg. 54,983 (Dep't Commerce Sept. 3, 2020) ......................................... 2

*Light-Walled Rectangular Pipe and Tube From People's Republic of China:
    Final Affirmative Countervailing Duty Investigation Determination,*

73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) .................................................... 16, 17

Redetermination Pursuant to Court Remand Order, *POSCO v. United States*, No.
17-00137 (Ct. Int'l Trade July 6, 2021), ECF No. 119........................................................ 5, 9

*Steel Concrete Reinforcing Bar From the Republic of Turkey:*
  *Final Affirmative Countervailing Duty Determination*,
  82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) ....................................................... 15

*Welded Line Pipe From the Republic of Korea: Final Negative Countervailing*
  *Duty Determination*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) ........................ 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| NUCOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **NON-CONFIDENTIAL** |
| v. | ) | Proprietary Information |
| | ) | Removed from Pages 4-6 |
| UNITED STATES, | ) | |
| | ) | Court No. 22-00050 |
| Defendant, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| HYUNDAI STEEL COMPANY and | ) | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**DEFENDANT-INTERVENOR HYUNDAI STEEL'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2, and the May 27, 2022 Scheduling Order, ECF No. 30, Hyundai

Steel Company ("Hyundai Steel") files this brief in opposition to Plaintiff Nucor Corporation's

("Nucor" or "Petitioner") July 25, 2022 Rule 56.2 Motion for Judgment on the Agency Record,

ECF Nos.34-35 ("Petitioner Br."). Scheduling Order, *Nucor Corporation v. United States*, No.

22-00050 (Ct. Int'l Trade May 27, 2022), ECF No. 30; Petitioner Rule 56.2 Motion for Judgment

on the Agency Record, *Nucor Corporation v. United States*, No. 22-00050 (Ct. Int'l Trade July

25, 2022), ECF Nos. 34-35. As discussed more fully below, Petitioner argues that the U.S.

Department of Commerce ("Commerce") erred both in its assessment of the facts related to the

Government of Korea's ("GOK") provision of electricity and in the methodology used to

determine whether electricity was provided for less than adequate remuneration ("LTAR").

Petitioner's arguments are without merit and the Court should reject them.[1]

---

[1] Citations to the administrative record shall be to the public or confidential record document
number ("PR" or "CR").

I.      **RULE 56.2 STATEMENT**

A.  **Administrative Decision under Review**

The administrative determination under review is *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) ("*Final Results*") (PR 216) and accompanying Issues and Decision Memorandum ("IDM" or "Final Decision Memo") (PR 213).  The period of review ("POR") is January 1, 2019 through December 31, 2019.

B.  **Issues of Law Presented**

Whether the methodology used by Commerce to determine that no measurable benefit existed from the GOK's provision of electricity was in accordance with law, and whether Commerce's determination was supported by substantial evidence.

II.     **STATEMENT OF FACTS**

Commerce initiated the countervailing duty ("CVD") administrative review of *Certain Corrosion-Resistant Steel Products From the Republic of Korea* on September 9, 2020, which covers entries made by Hyundai Steel and KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd.) ("Dongbu") in calendar year 2019.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 54,983 (Dep't Commerce Sept. 3, 2020) (PR 9).  Hyundai Steel and Dongbu were selected as the two mandatory respondents.  PR 25.

On January 4, 2021, United States Steel Corporation and Nucor Corporation (collectively, "Petitioners") submitted a new subsidy allegation ("NSA").  PR 96.  In its NSA, Petitioners alleged that the GOK sold electricity for LTAR.  PR 96.  On February 1, 2021, Commerce initiated an investigation into the alleged provision of electricity for LTAR in Korea.  PR 109.

2

Commerce issued Hyundai Steel and Dongbu Steel questionnaires regarding Petitioners'

New Subsidy Allegation, to which they provided responses on February 9, 2021.  CR 212-217 (PR

123); CR 219–221 (PR 129).  Commerce also issued a supplemental questionnaire to the GOK,

which provided a response on February 23, 2021.  CR 222–227 (PR 130).

In its initial new subsidy questionnaire response, the GOK described the structure of the

Korean electricity industry and market, as well as the operations of the state-owned electric

utility, Korea Electric Power Corporation ("KEPCO").  *Id*. at 3–4.  The GOK explained that

"KEPCO is the exclusive supplier of electricity in Korea" and that KEPCO purchases electricity

from generators through a market called the Korea Power Exchange ("KPX") in order to sell it to

customers throughout Korea.  CR 222–227 (PR 130), at 4.  "{A}ll electricity customers in Korea

purchase electricity from KEPCO," except for those in areas covered by "community energy

systems."  *Id.*   Electricity in Korea is generated by six generators that are KEPCO subsidiaries,

*id.* at 3–4, Ex. E-1, p. 31, but the price at which KEPCO purchases electricity in the KPX is

governed by a formula that accounts for the variable cost of generating electricity (the "marginal

price") and the fixed cost of generating electricity (the "capacity price").  *Id*. at 24–25.  The price

of electricity is further adjusted by an adjustment coefficient based on other factors including

proximity of a generation unit network and fuel constraints and the amount of power loss to

improve overall cost-efficiency.  *Id.*  Because the price of electricity in Korea is determined by a

set formula whose inputs are assessed by a Cost Evaluation Committee, no electricity supplier

can "exercise control" over the system "to such supplier's strategic advantage."  *Id.* at 24.

The GOK also provided "KEPCO's 2019 cost data for supplying electricity."  *Id.* at 13,

Ex. E-17.  These costs "include{d} the payment for the purchase of electricity, labor costs, grid

maintenance fee" and various taxes and fees.  *Id.*  According to KEPCO's cost data, Hyundai

Steel and Dongbu paid for electricity based on industrial electricity prices set out in a generally

applicable electricity tariff schedule.  *Id.* at 14, Ex. E-9.  This electricity tariff schedule charges

customers different prices based on their use during on-peak, mid-peak, and off-peak demand

periods.  *Id.* at Ex. E-9.  Pursuant to the electricity tariff schedule, Hyundai Steel and Dongbu

paid electricity under two tariff categories: [                                                    ].  CR 217 (PR

123) at 3; CR 219 (PR 129) at 2.  Hyundai Steel and Dongbu reported the monthly volume and

value of their electricity consumption during each of the relevant demand periods.  CR 219 (PR

129) at Ex. NSA-2; CR 217 (PR 123) at Ex. NSA-2.

      Commerce published the preliminary results of the review in the *Federal Register* on July

16, 2021.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary*

*Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 37,740 (Dep't

Commerce July 16, 2021) (PR 178) and accompanying Preliminary Decision Memorandum at 36

(PR 173).  Commerce found that KEPCO was the exclusive provider of electricity in Korea and

that there was no cross-border transmission or distribution of electricity into Korea from foreign

countries.  PR 173 at 32-33.  Accordingly, Commerce determined that neither domestic market-

determined prices nor world market prices were available for use as either a Tier 1 or Tier 2

benchmark for electricity pursuant to 19 C.F.R. § 351.511(a)(2)(i)-(ii).  *Id.* at 32-33.  Pursuant to its

practice where no domestic or world market prices are available, Commerce used a Tier 3

methodology to determine whether a benefit had been conferred by the provision of electricity for

LTAR; Commerce thus assessed whether KEPCO's prices were in accordance with market

principles.  *Id.* at 33.

      Specifically, Commerce compared the reported industrial tariff rate prices applicable to

Hyundai Steel and Dongbu to KEPCO cost data.  *Id.* at 36.  Commerce found that the cost

recovery for the [                    ] category was [                        ] and that the cost recovery for certain

[                                                                        ] were [

4

NON-CONFIDENTIAL

**]** respectively.  CR 257 (PR 174) at 5; CR 260 (PR 177) at 6.  Accordingly,

Commerce found that, for **[                    ]**, KEPCO recovered costs and included a rate of return

that comports with market principles.  CR 257 (PR 174) at 5.  Commerce also preliminarily found

that KEPCO did not recover costs for **[                            ]**.  *Id.*  To calculate the benefit

for **[                ]**, Commerce derived the benchmark rate by finding the difference of the amount

of cost recovered, **[                    ]** and 100 percent, which resulted in no measurable benefit to the

mandatory respondents.  CR 257 (PR 174) at 5; CR 260 (PR 177) at 6.

Thus, Commerce preliminarily determined that KEPCO supplied electricity to Hyundai

Steel and Dongbu for LTAR under the **[                ]** tariff class, but at a non-measurable benefit

amount.  CR 257 (PR 174) at 32–37.  In conducting its Tier 3 benchmark analysis to come to

these preliminary determinations, Commerce evaluated KEPCO's purchases through the KPX

and KEPCO's sales of electricity in the retail market.  PR 173 at 34-36.  Commerce determined

that "the price paid by KEPCO through KPX" is inclusive of the actual cost of generation and a

rate of return.  *Id.* at 35.  Moreover, Commerce "preliminarily determine{d} that KEPCO does

have a pricing mechanism in place that is based on market principles."  *Id.* at 36.  While the

industrial rates "did not always recover costs and a rate of return," Commerce calculated a

percentage amount "that would enable cost recovery and a rate of return" and, applying this

percentage amount to the rates assigned to Hyundai Steel and Dongbu, found that the amount

"resulted in a non-measurable benefit."  *Id.* at 36-37.

Commerce also examined KEPCO's six-wholly owned subsidiary electricity

generators' (the "GENCOs") financial performance and determined that they recovered their

costs, relying in part on its previous determination in the third administrative review of the same

order.  PR 173 at 34-35 (citing *Certain Corrosion-Resistant Steel Products From the Republic of*

*Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review;*

*2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021), and accompanying Issues and

Decision Memorandum at 9-10 and Comment 1).  As Commerce explained, the record evidence

demonstrates that "each of the six GENCOs recovered its costs."  PR 173 at 35.  Specifically,

Commerce "evaluated the marginal and capacity price . . . {and found that the marginal price}

includes consideration of the GENCOs' and KEPCO's rate of return."  *Id.* at 34-35.  Indeed, the

record shows that the GENCOs recovered their costs during 2019 and that the prices charged

included consideration of a rate of return.  *Id.*

Petitioner filed a case brief on August 26, 2021, arguing that Commerce's Tier 3

methodology under which Commerce had found no measurable benefit conferred by the GOK,

should be modified for the final results.  CR 264 (PR 196).  Dongbu and Hyundai Steel, as

respondents, timely filed rebuttal briefs on September 7, 2021.  CR 267 (PR 202).  The GOK

also timely filed a rebuttal brief on September 7, 2021.  PR 199.

Commerce issued the *Final Results* on January 12, 2022 and published them in the

*Federal Register* on January 19, 2022.  PR 216.  Commerce continued to determine that, based

on KEPCO's costs and revenues as well as KPX's pricing mechanism, KEPCO fully recovered

costs with regard to the [                    ] tariff class and that the GOK conferred no measurable

benefit on Hyundai Steel or Dongbu as to the [                    ] tariff class.  PR 213 at 15–19; *see,*

*e.g.,* CR 257 (PR 174) at 5 (unchanged in *Final Results*).  Commerce reiterated that "an

evaluation of a government supplier's income and costs and whether the income covers costs and

profit . . . has consistently been part of our analysis when assessing whether KEPCO's pricing is

consistent with market principles and has been found to be within the bounds of what {the

regulation} proposes."  PR 213 at 16.  Moreover, Commerce opined that "{t}his well-established

approach has been relied upon by Commerce in many cases and upheld by the CAFC in both

*Nucor* and *POSCO*."  *Id*. at 15.

As Commerce explained, its "tier-three methodology has been to first determine whether the prices are market-based.  Where prices are set in accordance with market principles and, thus, are at fair value, we determine no benefit is conferred; where they are not market-based (*i.e.*, they have not recovered costs plus profit), we determine a price that would be market-based and compare that to what was actually paid using a benchmark." *Id.* at 18.  Using this methodology again as it has previously done, Commerce agreed with the GOK that the KEPCO cost data reflected market prices because "the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit." *Id.*

Based in part on the determination that no measurable benefit was conferred by the provision of electricity for LTAR, Commerce calculated final subsidy rates of 0.47%, or *de minimis*, for Hyundai Steel and 10.51% for Dongbu.  PR 216 at 2,760.  This appeal followed.

## III.   **STANDARD OF REVIEW**

In reviewing a challenge to Commerce's determination in an administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## IV.   **SUMMARY OF ARGUMENT**

In the *Final Results*, Commerce applied its long-standing and judicially approved Tier 3 benchmark methodology to determine whether the mandatory respondents, Hyundai Steel and Dongbu, received a benefit from the provision of electricity for LTAR from KEPCO, the government electricity provider.  Commerce uses this Tier 3 methodology in situations where there are no actual market determined prices to use as benchmarks because the government supplier dominates the local market, and where actual world market prices are not available.  In

the absence of actual market determined benchmark prices to use for comparison, this Tier 3 methodology focuses on whether the price set by the government supplier is consistent with market principles by analyzing the price setting mechanism to determine whether the prices are set at a level that permits the government supplier to recover its costs and earn a profit.  This Tier 3 methodology is long-standing and Commerce has used it to evaluate electricity for LTAR allegations in Korea for years.  The U.S. Court of Appeals for the Federal Circuit has approved this Tier 3 methodology to the extent it focuses on whether KEPCO's prices are set based on a standard pricing mechanism that permits it to recover costs and make a profit.

Nevertheless, Petitioner argues that this well-established and judicially approved methodology is unlawful.  As Petitioner sees it, Commerce was required to compare the prices paid by the respondents to KEPCO's costs and rate of return as opposed to evaluating KEPCO's costs to determine whether the prices KEPCO charged to the respondents was sufficiently high to permit KEPCO to recover its costs and make a profit.   However, Petitioner has provided no coherent legal basis for why Commerce's methodology is unlawful.  Instead, it has relied on a patchwork of sources such as an out of context snippet from a Commerce remand determination, and various irrelevant parts of Commerce's regulations and statutory provisions.  None of these sources requires Commerce to use any particular methodology when facing LTAR programs involving a regulated utility market, nor do they prohibit the established methodology that Commerce has used in Korean cases.  Most glaringly, Petitioner has not dealt with the fact that the Federal Circuit has affirmed this Tier 3 methodological framework, and this is a consistently applied practice used by Commerce.   This legal challenge is thus without foundation and should be rejected.

Petitioner also argues that Commerce's finding that no measurable benefit was conferred using this established methodology is not supported by substantial evidence.  This argument is

based on Petitioner's assertion that Commerce cannot rely on KEPCO's actual cost data as part of its Tier 3 market principles analysis because the government controls the electricity market and thus these costs are not consistent with market principles.  This argument ignores the fact that the entire purpose and structure of Commerce's established Tier 3 market principles analysis is to analyze the government supplier's *costs* to determine whether the *prices* charged permit it to recover its costs and earn a rate of return sufficient to ensure its future operations.  If Commerce cannot rely on the government supplier's cost data then it cannot perform its analysis.  This argument is thus nonsensical and ignores Commerce's regulations, the *Preamble* to those regulations, and the long line of precedent that has affirmed the Tier 3 market principles analysis that is based on analyzing the government supplier's costs.  The record here demonstrates that KEPCO's prices were consistent with market principles because they permitted it to recover costs and earn a profit for the industrial category of electricity that was supplied to Hyundai Steel and Dongbu.  Petitioner's substantial evidence challenge should thus also be rejected.

## V.   <u>ARGUMENT</u>

Pursuant to the Tariff Act of 1930, a subsidy may be countervailed when a foreign government "provides a financial contribution" that is "specific" to an industry or enterprise and thereby confers a "benefit" to a person.  19 U.S.C. § 1677(5)(A)–(E).  A "financial contribution" may include when a foreign government "provides goods or services, other than general infrastructure." *Id.* § 1677(5)(D)(iii).  When the contribution is in the form of goods or services, a benefit is conferred "if such goods or services are provided for less than adequate remuneration." *Id.* § 1677(5)(E)(iv).  The adequacy of remuneration must be determined "in relation to prevailing market conditions," including price, quality, and availability, in the country where the good or service is provided. *Id.*  The statute otherwise delegates to Commerce the task of determining the adequacy of remuneration.  *Id.* § 1677(5)(C), (E).

Commerce's regulations establish a sequential three-tier methodology for analyzing the adequacy of remuneration.  As explained in the *Preliminary Results* of the instant review,

> Under 19 CFR 351.511(a)(2), Commerce determines whether electricity is provided for LTAR by comparing, in order of preference: (i) the government price to a market determined price for actual transactions within the country such as electricity tariffs from private parties (referred to as a Tier 1 benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to electricity consumers in the country in question (referred to as a Tier 2 benchmark); or (iii) *if no world market price is available then Commerce will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles* (referred to as a Tier 3 benchmark).

PR 173 at 32 (citing 19 CFR § 351.511(a)(2)(i)-(iii)) (emphasis added).

Thus, when using a "Tier 1" benchmark Commerce measures the adequacy of remuneration by comparing the government price to a market-determined price for actual transactions in the local market.  If no such Tier 1 prices exist then Commerce compares the government price to a world market price where those are available to consumers in the subject country.  This is a so-called "Tier 2" benchmark.  When there is no world market price available to purchasers in the country, Commerce "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles."  *Id.* § 351.511(a)(2)(iii).  This is known as a "Tier 3" benchmark, and is the benchmark at issue in this appeal.

A Tier 3 benchmark is normally used when the "prevailing market conditions" demonstrate that the market in question is a regulated monopoly.  In the *Preamble*, Commerce explains:

> Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price

10

discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case. In our experience, these types of analyses *may be necessary for such goods or services as electricity,* land leases, or water, and the circumstances of each case vary widely. *See, e.g.*, *Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) and *Venezuelan Wire Rod*.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998)

("*Preamble*") (emphasis added).  The regulations and *Preamble* thus make plain that a Tier 3

market principles analysis is applicable in situations exactly like this that involve a regulated

electricity utility market that result in there not being any "market determined" prices or "world

market" prices available to use as a Tier 1 or Tier 2 benchmark.

Consistent with its regulations, Commerce in the *Final Results* assessed whether the

electricity prices charged by KEPCO—Korea's state-owned electric utility and exclusive

supplier of electricity in Korea—are consistent with market principles using a Tier 3 benchmark

analysis.  Specifically, Commerce evaluated KEPCO's "electricity prices to see if they allow for

the recovery of costs, plus a rate of recovery or profit."  PR 213 at 15.  This Tier 3 methodology

has been upheld by the Federal Circuit.  *See Nucor Corp. v. United States*, 927 F.3d 1243 (Fed.

Cir. 2019) ("*Nucor*"); *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020).   Petitioner's

challenge to Commerce's Tier 3 methodology is unpersuasive, and essentially amounts to a legal

challenge to Commerce's own interpretation of its regulations.

### A. Commerce's Determination That The GOK Does Not Subsidize The Korean Steel Industry Through The Provision Of Electricity For LTAR Was Lawful.

At its core, Petitioner's argument is that Commerce's interpretation of its own regulation,

19 C.F.R. §351.511(a)(2)(iii), is not in accordance with law because its Tier 3 analysis focuses on

whether the *government price* is consistent with market principles as opposed to comparing the

price actually paid by the respondent to the government to a benchmark price.   In challenging

Commerce's interpretation of its own regulation, Petitioner has a tall mountain to climb.

Commerce's interpretation of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Torrington Co. v. United States*, 156 F.3d 1361, 1364 (Fed. Cir. 1998) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381 (1994)); *see also Samsung Elecs. Co., Ltd. v. United States*, 973 F. Supp. 2d 1321, 1330 (Ct. Int'l Trade 2014) (upholding Commerce's determination where its decision was "consistent with the regulation"). Where, as here, Commerce has consistently applied an interpretation of its own regulation, the court applies an even stronger "highly deferential review" to Commerce's interpretation. *Mittal Canada Inc. v. United States*, 30 C.I.T. 1565, 1574, 461 F. Supp. 2d 1325, 1333-34 (Ct. Int'l Trade 2006); *see also Carpenter Tech. Corp. v. United States*, 31 C.I.T. 181, 184, 474 F. Supp. 2d 1347, 1351 (Ct. Int'l Trade 2007) ("Commerce's interpretation of the revocation regulation… is supported by administrative precedent.").

In an attempt to scale this mountain, Petitioner first argues that under the Tier 3 methodology "Commerce must determine whether the <u>respondent</u> has received a benefit because the government's price to the <u>respondent</u> is for LTAR." Petitioner Br. at 12 (quoting POSCO Remand Results at 30). That is, Petitioner is arguing that Commerce's Tier 3 methodology, which evaluates whether KEPCO's electricity prices allow for the recovery of costs plus a rate of return, is unlawful because it does not directly compare the government price paid by the respondent to KEPCO's cost plus rate of return to determine whether a benefit exists. Petitioner's support for this argument is razor thin.

Petitioner first selectively quotes part of one sentence from Commerce's remand decision in the POSCO litigation, and uses it as the building block of its argument. Specifically, Petitioner relies on an incomplete sentence for the proposition that under the Tier 3 benefit regulation "'if the tariff <u>charged to the respondent</u> does not cover 'cost of production' plus a 'profitable return on the investment,' . . . then <u>the respondent</u> has received a countervailable benefit under section

771(5)(E) of the {Tariff} Act {of 1930}." *Id.* (emphasis added).   However, the key part of this sentence that Petitioner has omitted makes plain that Commerce was not saying that it must compare the price paid by the respondent to KEPCO's cost plus rate of return.  The full sentence says: "In other words, if the tariff charged to the respondent does not cover 'cost of production' plus 'a profitable return on the investment,' which is the same standard set forth in KEPCO's standard pricing methodology, then the respondent has received a countervailable benefit under section 771(5)(E) of the Act."  POSCO Remand at 30 (portion omitted by Petitioner underlined). The reference to KEPCO's standard pricing methodology is the cornerstone of Commerce's established Tier 3 methodology that focuses on whether the standard pricing methodology used by KEPCO to develop the electricity tariff rates that apply to the respondent permit it to recover its costs plus a return on investment.  *See, e.g.,* PR 173 at 33; PR 213 at 15.  This full quote thus actually undermines Petitioner's argument, and supports Commerce's focus on whether KEPCO's standard pricing mechanism permit it to recover costs plus make a profit.

Furthermore, by examining KEPCO's prices to determine if they are set high enough to permit it to recover its costs and earn a return on investment Commerce is making sure the price to the respondent covers costs plus profit.  After all, the prices charged to the respondents are those that are in KEPCO's tariff schedule.  *See* PR 213 at 17. To the extent this price is not set high enough to permit cost recovery and profit then Commerce will determine that the respondent received a countervailable benefit.  *See id.* at 18 (stating that where the government price is "not market based (*i.e.,* they have not recovered costs plus profit), we determine a price that would be market-based and compare that to what was actually paid using a benchmark.").  This is precisely what Commerce did when it determined that for one of the industrial rates applicable to Hyundai Steel and Dongbu the government price was not set high enough to permit cost recovery and

profit to KEPCO.  *See* PR 173 at 36.  Commerce then calculated a benefit for each respondent but found that the resulting benefits were not measurable.  *See e.g.,* CR 257 (PR 174) at 5.

Petitioner next cites to 19 U.S.C. §1677f-1(e) and its requirement that Commerce determine individual subsidy rates for each exporter/producer to support its argument that Commerce is required to compare the price paid by the respondent to KEPCO's cost plus rate of return.  Petitioner Br. at 12.  This is nonsensical.   When using its established Tier 3 methodology Commerce <u>does</u> calculate an individual subsidy rate for the respondent under review if the electricity prices are not consistent with market principles.  Indeed, as discussed above Commerce found that for one of the industrial rates applicable to Hyundai Steel and Dongbu KEPCO's price did not permit it to recover costs and a rate of return and therefore calculated an individual benefit.  That benefit was found to not be measurable, but illustrates that Commerce's established Tier 3 methodology is fully consistent with 19 U.S.C. §1677f-1(e).

Petitioner next cites a hodgepodge of provisions from Commerce's regulations to support its argument.  Specifically, Petitioner cites 19 C.F.R. § 351.503(b)(1) that provides that "the Secretary normally will consider a benefit to be conferred where <u>a firm pays</u> less for inputs . . . than it otherwise would pay," and 19 C.F.R. § 351.511(b) that provides that Commerce should "consider a benefit as having been received as of the date on which <u>the firm</u> pays or, in the absence of payment, was due to pay for the government-provided good or service."  Petitioner Br. at 12-13 (emphasis added).  Although not entirely clear, it appears that Petitioner is emphasizing the regulations' focus on "the firm" as demonstrating that Commerce has to compare the price paid by the respondent firm to the government price.  So construed, Commerce's established Tier 3 methodology is fully consistent as any benefit that results from a finding that the government supplier's prices were not consistent with market principles will apply to the firm's purchases.  Again, this is demonstrated by the calculations made by

14

Commerce for one of the industrial rates that were found to be inconsistent with market principles.  *See e.g.,* CR 257 (PR 174) at 5 & Attachment 2.

Petitioner next cites to numerous cases outside of Korea where Commerce has conducted its LTAR analysis by comparing the price paid by the respondent to the government supplier to the benchmark.  Petitioner Br. at 13-14 (and cases cited therein).[2]  Two of these cases do not involve a Tier 3 market principles analysis, but instead involve Tier 2 benchmarks and are thus inapposite.  *See Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) and accompanying Issues and Decision Memorandum at 20; *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) and accompanying Issues and Decision Memorandum at 12.   While the other cases involve a Tier 3 benchmark, they do not mandate that Commerce apply the same analysis to the Korean electricity market.  This is because Commerce is not required to conduct a Tier 3 market principles analysis in any particular way but instead has discretion to determine how to best measure whether the government's price in a regulated market is consistent with market principles.

In *Nucor*, the majority explained the broad nature of Commerce's authority in determining the adequacy of remuneration in markets that involve a monopoly supplier:

_____

[2] Petitioner also emphasizes that Commerce's questionnaire in LTAR investigations asks respondents to report the volume and value of their company specific input purchases and did so in this review.  *See* Petitioner Br. at 13.  It appears that Petitioner's point is that Commerce collects this company specific data to determine the actual benefit to the respondent or recipient of the subsidy.  However, when Commerce issues its LTAR questionnaire it does not yet know whether it is going to use a Tier 1, Tier 2, or Tier 3 benchmark and thus collects all necessary information to cover each analysis.  The questionnaire is not tailored to any specific type of benchmark analysis and so no conclusion can be drawn from this standard questionnaire and how Commerce must apply a Tier 3 market principles analysis.

In our analysis rejecting the government's broad position, we have decided that nonpreferentiality of the sort the government stresses is insufficient to meet the statutory standard of adequate remuneration, which, along with its implementing regulation, requires ensuring that the government authority's price is not too low considering what the authority is selling. That ruling is significant but limited in constraining Commerce. *We readily recognize that such a standard, while excluding the government's broad preferentiality position, leaves a large range of potential implementation choices. One need only look outside the present statutory context to the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as "fair value"), some on various measures of "cost" (which may reflect value). Verizon*, 535 U.S. at 484-86; *see generally id.* at 477-89; 122 S. Ct. 1646. Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations.

*Nucor*, 927 F.3d at 1254-55 (emphasis added).  Thus, what Commerce may or may not have done in other cases is not controlling as to what methodology it needed to use in this case.

Based on its faulty premise that Commerce was required to compare the prices paid by Hyundai Steel and Dongbu to KEPCO's costs plus profit, Petitioner next argues that Commerce erred by instead analyzing whether KEPCO covered its costs based on its revenues from all sales to all consumers in the relevant tariff classification.  *See* Petitioner's Br. at 18.   According to Petitioner, "Commerce's analysis ignored the prices paid by the respondents to the government supplier in determining whether a benefit exists." *Id.* at 14.   As support for its argument that KEPCO's overall financial performance "is irrelevant to an adequate remuneration benefit analysis" Petitioner cites to inapposite cases.

Petitioner first cites to *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China* and *Light-Walled Rectangular Pipe and Tube from the People's Republic of China* as support. Petitioner Br. at 17 (citing *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 31,966 (Dep't Commerce

16

June 5, 2008), and accompanying Issues and Decision Memorandum at 65; *Light-Walled Rectangular Pipe and Tube From People's Republic of China: Final Affirmative Countervailing Duty Investigation Determination,*73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008), and accompanying Issues and Decision Memorandum at 36.   While it is true that in these cases Commerce indicated that the profitability of Chinese producers of hot-rolled steel was not relevant to its determination, these cases are not on point as they both involve Tier 1 benchmarks and thus are not relevant to a Tier 3 market principles analysis as was used in the *Final Results* at issue here.   The other case cited by Petitioner—*U.S. Steel Corp. v. United States*—also does not support its calls to reject Commerce's Tier 3 methodology.   In that case, this Court found that the profitability of a supplier did not demonstrate that its prices were market-based, but in that instance, too, the issue was not the formulation of a Tier 3 benchmark.   Petitioner Br. at 17 (citing *U.S. Steel Corp. v. United States*, 33 C.I.T. 1935, 1944 n.10 (2009)).   Instead, the Court's statement was in response to an argument made by the respondent, who disagreed with Commerce's use of a Tier 2 benchmark.   *U.S. Steel Corp.*, 33 C.I.T. at 1944-45.

Although these cases are inapposite, there are legions of cases where Commerce has applied this Tier 3 market principles analysis in Korean cases in which it examined whether KEPCO was providing electricity for LTAR.   *See, e.g.*, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) and accompanying Issues and Decision Memorandum ("*CORE from Korea* IDM") at 18-24; *Welded Line Pipe From the Republic of Korea: Final Negative Countervailing Duty Determination*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015), and accompanying Issues and Decision Memorandum, at 13-18.   The use of a Tier 3 benchmark in these cases was affirmed on appeal.   *Nucor Corp. v. United States*,

286 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2018) ("Here, Commerce specifically determined that the relevant price for KEPCO's industrial tariff schedule is the price KEPCO pays for electricity through the Korea Power Exchange ('KPX'). Commerce then explained how KEPCO is able to recover its costs. Commerce's methodology is in accordance with law.") (citations omitted), *aff'd Nucor*, 927 F.3d 1243; *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1309-10 (Ct. Int'l Trade 2017) ("{T}he preamble to § 351.511 reasonably provides that Commerce may look solely at a government's price-setting philosophy (*i.e.*, its standard pricing mechanism) under a tier three benchmark analysis . . . {Commerce}'s interpretation of 'adequate remuneration,' namely, that in a tier three benchmark analysis, the adequacy of remuneration may be determined by taking into account a standard pricing mechanism analysis, was reasonable and thus in accordance with law.").  These cases all focus on whether KEPCO's tariff rate applicable to the respondent(s) covers costs and a rate of return, yet Petitioner fails to address this long line of consistent cases.

Petitioner lastly argues that Commerce's Tier 3 market principles analysis "contravenes the 'fundamental basis for identifying and measuring subsidies under U.S. {countervailing duty} practice" that provides that "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient."  Petitioner Br. at 17 (quoting 19 U.S.C. §1677(5)(E) (emphasis added)). According to Petitioner, the fact that "KEPCO may cover its costs plus a reasonable rate of return on all sales under a particular electricity tariff rate would mean only that there is no cost to the GOK from providing the subsidy because it is able to recoup losses on sales to some customers with excess returns on sales to other customers."  *Id*. at 17-18.  However, Commerce's methodology does determine whether there is a benefit to the recipient because if the government supplier does not recover costs plus a rate of return Commerce will calculate a benefit and assign

it to the respondent recipient, as it did for the one industrial category that it found was not
consistent with market principles.  *See* PR 173 at 36; CR 257 (PR 174) at 5.

In summary, Petitioner has failed to meet its high burden of demonstrating that the Tier 3
market principles analysis that Commerce applied in the *Final Results* is not in accordance with
law.  There is nothing plainly erroneous about Commerce's methodology, and since the Tier 3
market principles regulation in 19 C.F.R. §351.511(a)(2)(iii) is ambiguous and does not mandate
any particular methodology there is no basis to find that Commerce's methodology is inconsistent
with the plain language of its regulation.  *See, e.g., Torrington Co.*, 156 F.3d at 1364.
(Commerce's interpretation of its own regulations "must be given controlling weight unless it is
plainly erroneous or inconsistent with the regulation.") (quoting *Thomas Jefferson Univ.*, 512
U.S. at 512);  Finally, Commerce's Tier 3 market principles analysis has been consistently applied
in Korean electricity cases and the Federal Circuit has affirmed Commerce's focus on KEPCO's
cost recovery plus profit method for determining if KEPCO's prices are consistent with market
principles.  *See Nucor*, 927 F.3d at 1254; *POSCO*, 977 F.3d at 1377.  The Court should thus reject
Petitioner's argument and affirm Commerce's methodology.

**B. Commerce's Determination That The GOK Does Not Subsidize The Korean
Steel Industry Through The Provision Of Electricity For LTAR Is Supported
By Substantial Evidence.**

Petitioner also challenges Commerce's finding of no measurable benefit from the
provision of electricity for LTAR as being unsupported by substantial evidence.  Specifically,
Petitioner challenges Commerce's reliance on KEPCO's cost data for purposes of its Tier 3
market principles analysis because the GOK has control over the electricity market in Korea.
*See* Petitioner Br. at 18-21.  More specifically, since the GOK controls the electricity market
Petitioner argues that "{b}ecause substantial evidence contradicts Commerce's assumption that
the GOK's reported cost data reflect market principles, Commerce's determination that 'some

19

electricity prices were in line with market principles,' . . . should be remanded."  *Id.* at 22.  This argument is misplaced.

There is no dispute that the electricity market in Korea is a regulated monopoly that is controlled by the GOK.  *See, e.g.,* PR 173 at 32.  This is precisely the reason why Commerce resorted to a Tier 3 benchmark in the first place.  *See id.* 32-33.  As discussed in the *Preamble,* a Tier 3 market principles analysis is appropriate in instances that involve regulated utility markets such as electricity, land leases, or water.  *See Preamble*, 63 Fed. Reg. at 65,378.   Indeed, the entire purpose of the Tier 3 market principles analysis is to determine if the government supplier's price is set in accordance with market principles "through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination."  *Id.*   Petitioner's argument that Commerce erred in actually analyzing KEPCO's costs as part of its Tier 3 analysis is thus contrary to the very purpose of the analysis as indicated by the *Preamble*.  Using KEPCO's cost data does not as Petitioner insinuates, indicate that Commerce is deciding that KEPCO's cost data is consistent with market principles.  Rather, the KEPCO cost data is used as the basis for determining whether the government *price* is consistent with market principles.  *See* PR 213 at 16 ("However, under 19 CFR 351.511(a)(2)(iii), we are required to assess the extent to which the price charged by the government is consistent with market principles.") (emphasis added).

Having determined that the electricity market in Korea is a regulated monopoly, it was entirely lawful—and reasonable—for Commerce to rely on an analysis of whether KEPCO's prices were consistent with market principles by analyzing if KEPCO recovered costs and made a profit under Tier 3 of its regulations.  PR 213 at 18.  The Federal Circuit has previously described Commerce's "prima facie leeway" to choose from among "the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some

directly focused on value . . . some on various measures of 'cost.'"  *Nucor*, 927 F.3d at 1254-55.

This analysis and use of KEPCO's cost data as part of a Tier 3 market principles analysis to

determine if KEPCO's prices were consistent with market principles is thus fully consistent with

Commerce's regulations and precedent.

Finally, Petitioner argues that even using KEPCO's cost data, "the respondents reported

electricity prices '{did} not cover 'cost of production' plus a 'profitable return on the

investment'"  Petitioner Br. at 22 (citing POSCO Remand at 30).   As support, Nucor compares

the prices that Hyundai Steel and Dongbu paid during the so-called "off peak" and "mid peak"

time periods to KEPCO's reported cost of supply during those time periods to demonstrate that

the prices paid in this time periods was below KEPCO's cost of supply.  *See id.* at 22-23.

However, Petitioner provides no legal basis or justification for why Commerce is required to

conduct a segmented time of use analysis rather than its normal and established analysis of

whether KEPCO recovered its costs for the overall industrial category that is applicable to

Hyundai Steel and Dongbu.  As discussed, the Federal Circuit has affirmed Commerce's

established Tier 3 market principles analysis that is based overall cost recovery for the tariff rate

applicable to the respondents.  Absent an argument or basis why this judicially approved method

is unlawful Petitioner is merely offering an alternative methodology.  This does not render

Commerce's determination unsupported by substantial evidence.  *See Ningbo Dafa Chem. Fiber

Co., Ltd. v. United States*, 580 F. 3d 1247, 1259-61 (Fed. Cir. 2009) ("{R}eviewing courts must

accord deference to the agency in its selection and development of proper methodologies . . . {i}n

fact, the 'methodologies relied upon by Commerce in making its determinations are

presumptively correct.'") (citations omitted); *Hyster Co. v. United States*, 18 C.I.T. 589, 592-93,

858 F. Supp. 202, 206 (Ct. Int'l Trade 1994) ("It is not for this Court to direct Commerce to

choose one methodology over another where both methodologies are reasonable. While plaintiffs

articulate another possible methodology, they fail to demonstrate to the Court how the methodology used by Commerce is unreasonable, not based on substantial evidence or not in accordance with law."); *Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1177 (Ct. Int'l Trade 2016) ("Commerce's approach is deemed lawful if its 'methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting {its} conclusions.'").

## VI.    <u>**CONCLUSION**</u>

Based on the foregoing, Hyundai Steel respectfully requests that this Court reject

Petitioner's arguments and affirm the *Final Results* consistent with the arguments made herein.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

*Counsel to Hyundai Steel Company*

23

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 7,094 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills