## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NUCOR CORPORATION, )<br><br>Plaintiff, )<br><br>and )<br><br>STEEL DYNAMICS, INC., )<br><br>Plaintiff-Intervenor, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>HYUNDAI STEEL COMPANY and<br>GOVERNMENT OF THE REPUBLIC OF<br>KOREA, )<br><br>Defendant-Intervenors. ) | Before: Hon. Jennifer Choe-Groves,<br>Judge<br><br>Court No. 22-00050<br><br>NONCONFIDENTIAL<br><br>Business Proprietary Information<br>Removed from Pages 4, 5, 23,<br>27-29, 31, and 32. |

## DEFENDANT-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: October 7, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................1

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ..................................1

STATEMENT OF ISSUES ..........................................................................................1

STATEMENT OF FACT ..............................................................................................1

STANDARD OF REVIEW ..........................................................................................10

ARGUMENT ............................................................................................................12

I.    Commerce's Assessment Of The Adequacy Of Remuneration Is Lawful....................12

      A.    Commerce Has Discretion in Deciding How to Assess the Adequacy of
            Remuneration................................................................................................12

      B.    Commerce's Approach Is Lawful ................................................................14

II.   Commerce's Findings Regarding The Adequacy Of Remuneration Are Supported
      By Substantial Evidence ..........................................................................................20

      A.    Record Evidence Demonstrates that the Korean Electricity Market Is
            Governed by Market Principles ....................................................................21

      B.    The Costs Upon Which Commerce Relied Are Not Tainted ................................25

      C.    The Government Prices to the Respondents Reflected the Cost of
            Electricity Generation Plus a Return on Investment................................27

CONCLUSION ........................................................................................................33

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003)............................................. 12

*AMS Assocs., Inc. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013) ........................................... 11

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd*,
    810 F.2d 1137 (Fed. Cir. 1987) ........................................................................... 11-12, 19

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)............ 10

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ........................................................... 10, 24

*CS Wind Vietnam Co. v. United* States, 832 F.3d 1367 (Fed. Cir. 2016)....................................... 10

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018); *accord Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .................................................................................................... 11

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016).................................... 10

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ......................................... 10

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019)....................................... 14, 18, 21

*POSCO v. United States*, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ........................................ 17

*POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) ..................... 17, 20, 21, 29

*POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) ............................ 17, 19, 32

*POSCO v. United States*, 977 F.3d 1369, 1372 (Fed. Cir. 2020) ................................................. 13

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) .......................................................... 11

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004)..................................................... 11

*U.S. Steel Co. v. United States*, 33 CIT 1935 (2009) ................................................................. 16

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) .................................................................. 11

*Verizon Commc'ns Inc. v. Fed. Commc'ns Comm'n,* 535 U.S. 467 (2002)................................... 21

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................................. 10

19 U.S.C. § 1677(5)(E)(iv) ............................................................................................... passim

19 U.S.C. § 1677f-1(e)........................................................................................................... 15

28 U.S.C. § 1581(c) .............................................................................................................. 10

## RULES

*Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final
    Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances
    Determination,* 82 Fed. Reg. 16,341 (Apr. 4, 2017) ............................................................. 22

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935
    (Dep't Commerce July 29, 2016)......................................................................................... 16

*Certain Corrosion-Resistant Steel Products from the Republic of Korea. Certain Corrosion-
    Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of
    Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan.
    19, 2022) ........................................................................................................................... 1

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and
    Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237
    (Dep't Commerce June 1, 2021)........................................................................................... 6

*Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008) ........................................................................ 16

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ............................................................................... 16

*Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) ........................................................................................................................................ 16

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 4,996 (July 29, 2016) .................... 22

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (June 2, 2016) ............................ 22

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 53,439 (Aug. 12, 2016) ................ 22

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) ........................................................................... 16

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021) ..... 6

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) ........................................................................................... 16

*Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) .. 17

*Welded Line Pipe from the Republic of Korea: Final Negative Countervailing Duty Determination,* 80 Fed. Reg. 61,365 (Oct. 13, 2015) ............................................................ 22

## REGULATIONS

19 C.F.R. § 351.503(b)(1) .............................................................................................. 15-16

19 C.F.R. § 351.511(a)(2) ................................................................................................ 7, 12

19 C.F.R. § 351.511(a)(2)(i) ........................................................................................... 12, 15

19 C.F.R. § 351.511(a)(2)(ii) .......................................................................................... 13, 15

19 C.F.R. § 351.511(a)(2)(iii) ................................................................................. 9, 13, 15, 21

## OTHER AUTHORITIES

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) .................................... 13, 18, 22, 24

## INTRODUCTION

This brief is submitted on behalf of the Government of the Republic of Korea ("GOK") in response to the arguments raised by Plaintiff, Nucor Corporation (hereinafter "Plaintiff"), relating to alleged errors of law and analysis committed by the U.S. Department of Commerce ("Commerce") in the 2019 administrative review of the countervailing duty ("CVD") order on Corrosion-Resistant Steel Products ("CORE") from the Republic of Korea.  *See* Pl. Nucor Corp.'s Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 34 ("Pl. Br.").

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Plaintiff challenges certain aspect of Commerce's final results in the 2019 administrative review of the CVD order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea*.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (P.R.216) ("*Final Results*").

## STATEMENT OF ISSUES

1.     Whether Commerce's assessment of the adequacy of remuneration for electricity provided by the GOK is in accordance with law.

2.     Whether Commerce's determination that the GOK did not subsidize the respondent companies through the provision of electricity for less than adequate remuneration is supported by substantial evidence on the record.

## STATEMENT OF FACT

***Initiation of Review and New Subsidy Allegation Regarding the Provision of Electricity***

Commerce initiated the administrative review at issue in this case on September 9, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 54,983 (Dep't Commerce Sept. 3, 2020) (P.R.9).  Commerce selected Hyundai Steel Company

("Hyundai Steel") and KG Dongbu Steel Co., Ltd. ("Dongbu") as the mandatory respondents. Memorandum from Joshua Simonidis to Irene Darzenta Tzafolias, "Administrative Review of the Countervailing Duty Order on Certain Corrosion-Resistant Steel Products from the Republic of Korea: Respondent Selection Review" (Oct. 6, 2020) (C.R.4/P.R.25).

On January 4, 2021, Petitioners (including Plaintiff) filed a new subsidy allegation alleging, in part, that the GOK provided a countervailable subsidy to the respondent companies in the form of electricity for less than adequate remuneration ("LTAR"). Letter from Cassidy Levy Kent LLP and Wiley Rein LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea: Petitioner's New Subsidy Allegation" (Jan. 4, 2021) (P.R.96). Commerce initiated a review of this alleged program on February 1, 2021. Memorandum from Dennis McClure to Irene Darzenta Tzafolias, "Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: New Subsidy Allegation" (Feb. 1, 2021) (P.R.109).

### The GOK's and Mandatory Respondents' Questionnaire Responses

The GOK responded to initial and supplemental questionnaires between February and July 2021 regarding the alleged provision of electricity for LTAR. *See* Letter from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New Subsidy Allegations Questionnaire Response" (Feb. 23, 2021) ("GOK NSA QR") (C.R.222-227/P.R.130); Letter from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New Subsidy Allegations Supplemental Questionnaire Response" (Mar. 11, 2021) ("GOK 1st NSA SQR") (C.R.230-234/P.R.140); Letter from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case

No. C-580-879: GOK's New Subsidy Allegations Second Supplemental Questionnaire Response" (Apr. 13, 2021) ("GOK 2nd NSA SQR") (C.R.238-240/P.R.146); Letter from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New Subsidy Allegations Third Supplemental Questionnaire Response" (Apr. 27, 2021) ("GOK 3rd NSA SQR") (C.R.242-243/P.R.149); Letter from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: GOK's New Subsidy Allegations Fourth Supplemental Questionnaire Response" (July 2, 2021) ("GOK 4th NSA SQR") (C.R.255/P.R.169).

The GOK explained in its questionnaire responses that the electricity market is comprised of three different segments: electricity generation, electricity transmission, and electricity distribution. GOK NSA QR at 3. It noted that most electricity in Korea is generated by six subsidiaries of the Korea Electric Power Company ("KEPCO") referred to as "GENCOs,"[1] although some electricity is also generated by independent power generators and community energy systems. *Id.* at 3, 5. However, none of these generation companies directly transmit or distribute electricity to the consumers. *Id.* at 3. Instead, KEPCO is the exclusive supplier of electricity in Korea. *Id.* at 3-4. KEPCO purchases electricity from the generation companies via the Korea Power Exchange market ("KPX") for distribution to the ultimate customer. *Id.* at 3-4.

The GOK provided information establishing that KEPCO's tariff schedule applicable for the period of review ("POR") of 2019 set electricity prices sufficient to cover costs, including those related to electricity generation, plus a return on investment. The GOK noted that, by law,

---

[1] These GENCOs are Korea Hydro & Nuclear Power Co., Korea South-East Power Co., Korea Midland Power Co., Korea Western Power Co., Korea Southern Power Co., and Korea East-West Power Co.

KEPCO is required to establish tariff rates at levels that recover the aggregate costs for supplying electricity. *Id.* at 7, 9. Although rates are not adjusted on a yearly basis, they are set to generally achieve a return on investment. *Id.*

Further, record evidence establishes that, in 2019, KEPCO earned profit more than sufficient to cover costs (including for the generation of electricity), plus a return on investment. *Id*. First, the GOK submitted to Commerce information related to KEPCO's operating expenses (which include payment for the purchase of electricity, labor costs, grid maintenance fees, and other fees not related to the sales of electricity), and demonstrated how its income covers its costs, plus a return on investment. GOK NSA QR at 12-16 (C.R.222/P.R.130); GOK 1st NSA SQR Exhibit E-17.1 (C.R.232/P.R.140).[2] The GOK explained in detail how KEPCO calculates its return on capital (i.e., rate of return). *See* GOK 1st NSA SQR at 2-7 (C.R.201/P.R.106); GOK 2nd NSA SQR at 4-7 (C.R.238/P.R.146); GOK 3rd NSA SQR at 4-5 (C.R.242/P.R.149). In addition, the GOK submitted to Commerce the outside audit report of its overall cost for electricity (GOK 1st NSA SQR at Exhibit E-20) (C.R.232/P.R.140) and provided a fulsome explanation regarding how the results of this audit report connect to the expenses and income the GOK reported. *See* GOK 2nd NSA QR at 1-4 (C.R.238/P.R.146). Based on this information, the GOK demonstrated that KEPCO's cost recovery rate in 2019 for [

]. GOK NSA QR at 14-16 (C.R.222/P.R.130); GOK 1st NSA SQR Exhibit E-17.1 (C.R.232/P.R.140).

The GOK also provided information regarding the price at which KEPCO purchases electricity from KPX to demonstrate that these prices were sufficient to cover the cost of

---

[2] The GOK resubmitted the cost information provided in its initial questionnaire response in Exhibit E-17.1 to correct certain errors that occurred due to translation issues that impacted the applicable formulas.

electricity production, plus a return on investment for the electricity generators. This price is determined by a formula involving a variable cost component (marginal price), a fixed cost component (capacity price), and an adjusted coefficient factor. GOK NSA QR at 24-25 (C.R.222/P.R.130). Each of the price components has its own purpose: (1) the marginal price is the amount calculated to compensate the generation companies for fuel costs, the principal component of the variable costs of generating electricity; (2) the capacity price is calculated to compensate the generation companies for fixed costs related to constructing generation facilities; and (3) the adjusted coefficient is calculated to prevent KEPCO's overpayment to certain generation companies with low fuel costs and to maintain a differential between the expected rate of return between the GENCOs and KEPCO. *Id.* at 24-26.

Finally, the GOK provided information substantiating that the price at which KEPCO purchased electricity via the exchange was sufficient to compensate the GENCOs. It first noted that KEPCO is legally required to pay the GENCOs the amount (i) to recover their total costs (including fuel, maintenance, and administrative costs) and (ii) to pay their interest for loans. GOK 1st NSA SQR at 9 (C.R.230/P.R.140). The GOK explained [

] (*id.* at 9-11), and provided detailed information regarding the GENCOs' actual profit/loss information related to electricity activities [                                                      ]. GOK 2nd NSA SQR at 9-13, Exhibits E-25, E-27 (C.R.238-239/P.R.146); GOK 3rd NSA SQR at 6-7 (C.R.242/P.R.149). The GOK also placed the financial statements of the six generation companies on the record (GOK 4th NSA SQR at Exhibit E-33 (C.R.255/P.R.169)), as it had in the third administrative review of the underlying CVD order as well as in the 2019 investigation on seamless pipes. *See Certain Corrosion-Resistant Steel Products From the Republic of Korea:*

5

*Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021); *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021).

Hyundai Steel and Dongbu also responded to initial and supplemental questionnaires regarding the alleged provision of electricity for LTAR.  Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's New Subsidy Allegations Questionnaire Response" (Feb. 9, 2021) ("Dongbu NSA QR") (C.R.212-217/P.R.123); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Hyundai Steel's New Subsidy Allegations Questionnaire Response" (Feb. 23, 2021) ("Hyundai Steel NSA QR") (C.R.219-221/P.R.129); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's NSA Supplemental Questionnaire Response" (July 2, 2021) ("Dongbu NSA SQR") (C.R.253/P.R.167); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Hyundai Steel's NSA Supplemental Questionnaire Response" (July 2, 2021) ("Hyundai Steel NSA SQR") (C.R.254/P.R.168). Hyundai Steel and Dongbu included in their responses information regarding their payments for electricity.  Specifically, the respondents explained which tariff classifications covered their purchases of electricity and provided information regarding the tariff rates applicable to their electricity purchases, the total amount purchased during different time periods (by month and time of day), and total amount paid to KEPCO.  Dongbu NSA QR at 2-3, Exhibits NSA-2 and

NSA-4 (C.R.217/P.R.123)); Hyundai Steel NSA QR at 2-3, Exhibits NSA-2 and NSA-4

(C.R.219/P.R.160).

***Commerce's Preliminary Results***

In the Preliminary Results, Commerce concluded that it should use a "tier-iii" benchmark

pursuant to 19 C.F.R. § 351.511(a)(2) to determine whether the GOK was providing electricity

for LTAR.  Memorandum from James Maeder to Christian Marsh, "Decision Memorandum for

the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain

Corrosion-Resistant Steel Products from the Republic of Korea" (July 12, 2021) ("*Preliminary*

*Results IDM*") at 32-33 (P.R.173).  In the first step in its analysis, Commerce considered whether

the prices charged by each segment in the Korean electricity market were set in accordance with

market principles:

- **First**, Commerce noted that the tariff schedule establishing the prices charged by KEPCO for electricity applicable during the POR came into effect in November 2013 and that Commerce had previously determined that this schedule was set in accordance with market principles, including that the rates were set with consideration to costs and a return on investment.  *Id.* at 33.

- **Second**, Commerce noted that it had previously evaluated the price-setting mechanism that establishes the prices KEPCO pays KPX for electricity supply and found no benefit.  *Id.* at 34.

- **Third**, Commerce noted that it had previously evaluated the six GENCO's financial statements that were placed on the record in this review and concluded that each generating company recovered its costs during the POR.  *Id.* at 34-35.

Based on this information, Commerce concluded that the prices set by each segment were set in

accordance with market principles.

In the second step, Commerce considered whether the specific tariff rates charged by

KEPCO were sufficient to recover costs and a return on investment.  Commerce, in conducting

this analysis, considered whether the electricity rates for each tariff classification applicable to

the mandatory respondents were sufficient to cover costs plus a return on capital.  *Id.* at 36.

7

Commerce determined that certain rates were not.  For those rates applicable to the mandatory respondents that were not sufficient to cover costs plus a return on capital, Commerce determined that the rates were not set in accordance with market principles and proceeded to assess whether any benefit was measureable.  *See id.* at 36-37.

### Commerce's Final Results

Following Commerce's *Preliminary Results*, Plaintiff filed a case brief challenging Commerce's methodology and findings regarding the alleged provision of electricity for LTAR. Brief from Wiley Rein LLP to Sec'y of Commerce, "Corrosion-Resistant Steel Products from the Republic of Korea: Case Brief" (Aug. 25, 2021) (C.R.264/P.R.196).  In response, the GOK and the mandatory respondents filed rebuttal briefs supporting Commerce's preliminary analysis and findings.  Brief from Yoon & Yang LLC to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879:  GOK's Rebuttal Brief" (Sept. 7, 2021) at 6 (P.R.199); Brief from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Respondents' Rebuttal Brief" (Sept. 7, 2021) (C.R.267/P.R.202).

In the *Final Results*, Commerce reaffirmed its positions with respect to the GOK's provision of electricity.  Specifically, Commerce found that certain tariffs applicable to the mandatory respondents were in line with market principles because they allowed KEPCO to fully cover its costs plus a rate of recover or profit.  Memorandum from James Maeder to Lisa Wang, "Issues and Decision Memorandum for the Final Results and Partial Rescission of the 2019 Administrative Review of the Countervailing Duty Order on Certain Corrosion-Resistant Steel Products from the Republic of Korea" (Jan. 12, 2022) ("*Final Results IDM*") at 15, 17-18 (P.R.213).  Commerce further noted that, "where the pricing is not in line with market principles,

we determined that a benchmark that would be in line with market principles (i.e., a price that covers cost plus a rate of recovery or profit), with the difference between the price paid and the benchmark being the benefit conferred." *Id.* at 15.  Applying that methodology, Commerce found that there was no measureable benefit from the electricity provided at prices that were not in line with market principles.  *Id.*

Commerce also fully considered and rejected Plaintiff's arguments that it should modify its approach.  Commerce declined Plaintiff's suggestion that Commerce abandon its well-established three-tier approach and instead apply a standard where Commerce directly compares the various prices paid by the respondents to a single cost plus profit rate for KEPCO to determine if a benefit exists.  Commerce noted that a consideration of whether income covers costs plus profit has long been a part of its tier-iii analysis and has been found by the courts to be within the bounds of 19 C.F.R. § 351.511(a)(2)(iii).  *Final Results IDM* at 17 (P.R.213).  It further rejected Plaintiff's argument that Commerce's analysis should focus solely on the rates that Hyundai Steel and Dongbu paid, noting that the analysis it employed was sufficient because the mandatory respondents paid prices at the same rates as all companies in the corresponding electricity consumption category.  *Id*.  Commerce explained that its analysis therefore does consider whether KEPCO's approach for setting those rates is in accordance with market principles.  *Id*.

Commerce also addressed Plaintiff's claim that the cost data provided by the GOK does not reflect actual costs of electricity generation.  In the *Final Results*, Commerce fully explained how its analysis took into consideration this issue, noting that "we agree with the GOK that the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit."  *Final Results*

*IDM* at 17-18.  Finally, Commerce rejected Plaintiff's suggestion that it should rely on a benchmark price plus an average profit rate from publicly traded utilities in the United States to determine whether a benefit was conferred.  In particular, Commerce noted that the entire premise of a tier-iii analysis is that no such appropriate benchmark prices exist.  *Id.* at 18-19.

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

The substantial evidence standard requires Commerce to base its determination upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co. v. United* States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (internal quotation marks and citation omitted).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce}'s finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  A party challenging Commerce's finding for lack of substantial evidence "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

The Court reviews Commerce's interpretation of the statutes it administers under the two-step framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016).  Under the first step, the Court "must determine whether Congress has directly spoken to the precise question at issue."  *Id.* (internal quotation marks and citation omitted).  If it has, the

Court "must give effect to the unambiguously expressed intent of Congress." *Id.* (internal quotation marks and citation omitted).  If it has not, Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).  In such circumstances, "any reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted).

The Court must also ensure that Commerce has complied with its own regulations.  *See AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1343 (Fed. Cir. 2013).  The Court construes Commerce's regulations using "the same rules {that it} would use in construing a statute." *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018); *accord Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  Applying these rules, the Court defers to Commerce's "interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of {Commerce}'s intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted).  "{B}road deference" to Commerce's interpretation "is all the more warranted" because its regulations "concern{} a complex and highly technical regulatory program." *Id.* (internal quotation marks and citation omitted).

In terms of Commerce's choice of methodology in reaching its conclusions under the countervailing duty law, "{a}s long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986),

*aff'd*, 810 F.2d 1137 (Fed. Cir. 1987); *see also Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038 (Fed. Cir. 2003).

## ARGUMENT

### I.   COMMERCE'S ASSESSMENT OF THE ADEQUACY OF REMUNERATION IS LAWFUL

Plaintiff argues that Commerce's finding that the GOK did not provide electricity for LTAR was unlawful.  Pl. Br. 12-18.  Plaintiff fails to show that Commerce's finding is inconsistent with the statute or regulation.

#### A.   Commerce Has Discretion in Deciding How to Assess the Adequacy of Remuneration

Under the statute, "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The statute further directs that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review."  *Id.*  "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

The statute does not define what constitutes "adequate remuneration."  However, Commerce has issued regulations regarding how it will determine whether remuneration is adequate, setting forth a three-tiered, hierarchical approach.  19 C.F.R. § 351.511(a)(2).  Commerce first prefers to "measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  *Id.* § 351.511(a)(2)(i).  In selecting a benchmark, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting

comparability." *Id.* If no useable domestic market-determined price is available, Commerce "will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id.* § 351.511(a)(2)(ii). Under this second-tier approach, Commerce will "mak{e} due allowance for factors affecting comparability." *Id.*

This case involves Commerce's "tier-iii" methodology. Commerce applies its tier-iii methodology if there is "no world market price available to purchasers in the country in question." *Id.* § 351.511(a)(2)(iii). In that situation, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* "{I}f Commerce determines that government pricing is not consistent with market principles, then 'a benefit shall normally be treated as conferred.'" *POSCO v. United States*, 977 F.3d 1369, 1372 (Fed. Cir. 2020) (quoting 19 U.S.C. § 1677(5)(E)(iv)). The regulation, however, does not specify how Commerce will make that assessment. When it issued the regulation, Commerce explained in the Federal Register notice that, "in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) ("*Preamble*"). Commerce further stated that

> we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.

*Id.* These statements in the *Preamble* reflect a focus on how the price "was set" and demonstrate that Commerce did not intend to adopt a rigid framework for assessing "whether the government price was set in accordance with market principles." *Id.*

The Court of Appeals for the Federal Circuit ("Federal Circuit") has held that the statute and Commerce's implementing regulation require "ensuring that the government authority's price is not too low considering what the authority is selling." *Nucor Corp. v. United States*, 927 F.3d 1243, 1254 (Fed. Cir. 2019). The Federal Circuit also has emphasized that, although this principle is significant, it is "limited in constraining Commerce" and "leaves a large range of potential implementation choices." *Id.* "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations." *Id.* at 1255.

### B.     Commerce's Approach Is Lawful

Commerce assessed whether the government price was consistent with market principles by determining whether the electricity prices charged by KEPCO allow for the recovery of costs, plus a rate of return. *Final Results IDM* at 15 (P.R.213). In conducting that analysis, Commerce examined the electricity rates and costs for each tariff classification applicable to the mandatory respondents. *Preliminary Results IDM* at 36 (P.R.173). Plaintiff does not show that Commerce's methodology falls outside the "large range" of permissible choices for implementing the statutory and regulatory standard. *Nucor Corp.*, 927 F.3d at 1254-55.

Plaintiff asserts that the "{t}he statute, the regulation, and Commerce's practice . . . confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to the government supplier for the input under consideration." Pl. Br. 14; *see also id.* at 12-14. Plaintiff then claims that Commerce "ignored the prices paid by the respondents to the government supplier in determining whether a benefit exists," *id.* at 14, which Plaintiff argues is unlawful, *id.* at 14-18. Plaintiff's arguments are flawed.

14

First, the authorities cited by Plaintiff do not address how Commerce is to determine whether goods "are provided for less than adequate remuneration," pursuant to 19 U.S.C. § 1677(5)(E)(iv), when "assessing whether the government price is consistent with market principles" under the tier-iii methodology, 19 C.F.R. § 351.511(a)(2)(iii).  Plaintiff cites the statutory requirement that Commerce determine "individual countervailable subsidy rates."  Pl. Br. 12 (quoting 19 U.S.C. § 1677f-1(e)).  This provision does not directly address how to determine whether remuneration is adequate, and Commerce complied with this provision.  As Plaintiff itself notes, Commerce calculated separate, individual rates for Hyundai Steel and Dongbu in the *Final Results*.  Pl. Br. 10 (stating that Commerce calculated subsidy rate of 0.47% for Hyundai Steel and 10.51% for Dongbu).  As to electricity specifically, Commerce considered the tariff rates applicable to both Hyundai Steel and Dongbu and then used the companies' actual electricity purchases and sales information to calculate a benefit amount when Commerce found that certain tariff rates were not set in a manner consistent with market principles.  *See Preliminary Results IDM* at 36-37 (P.R.173); Hyundai Steel Preliminary Calculation Memorandum at 5 and Attachment II (C.R.257-258/P.R.174); Dongbu Preliminary Calculation Memorandum at 6 and Attachment IV (C.R.260-261/P.R.177).  Commerce found the benefit amounts to be non-measurable, but Commerce still performed an analysis for each company.

From the regulations, Plaintiff cites 19 C.F.R. § 351.503(b)(1) and § 351.511(a)(2)(i)-(ii). Section 351.503(b)(1) describes how Commerce will measure the benefit for programs not addressed elsewhere in its regulations.  Section 351.503(a) provides that, if there is a specific rule for the measurement of a benefit elsewhere in its regulations, then Commerce "will measure the extent to which a financial contribution . . . confers a benefit as provided in that rule."  As noted above, Commerce has a separate regulation specifically providing for its tier-iii

15

methodology, and thus § 351.503(b)(1) is irrelevant.  Plaintiff's citations to § 351.511(a)(2)(i)-(ii) are similarly inapposite, because they describe Commerce's tier-i and tier-ii methodologies, wherein Commerce's first step is to select a price as a benchmark to measure the adequacy of remuneration.  This case involves Commerce's application of the tier-iii methodology, which applies when such prices are not available.

Plaintiff's case citations either do not address the assessment of whether the government price is consistent with market principles or do not support Plaintiff's argument.  Plaintiff cites *Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008), *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017), *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008), *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008), and *U.S. Steel Co. v. United States*, 33 CIT 1935 (2009), Pr. Br. 13, 17, but the cited discussions in those cases all addressed Commerce's use of the tier-i or tier-ii methodologies, not tier-iii.  As Commerce previously has explained, the tier-iii methodology is distinct and "more complicated" than the other benchmark methodologies "because *the Department is no longer solely examining prices, but assessing how the government sets it prices* and whether the mechanism by which it determines its prices is consistent with market principles." *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), accompanying Issues and Decision Memorandum at 17-18 (emphasis added).  Plaintiff also cites *Certain Cold-Rolled Steel Flat Products from Russia* as well as *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535

(Dep't Commerce Oct. 20, 2015), which at least involved the tier-iii methodology.  Pl. Br. 13-14.
But the cited passages discuss how Commerce constructed a benchmark in order to calculate a
benefit amount *after* Commerce had already determined that the government prices were not set
consistent with market principles.  Plaintiff's challenge to Commerce's methodology in this case,
on the other hand, is focused on the threshold assessment of whether the government set prices in
a manner that is consistent with market principles, and the discussion of the specific calculations
in those cases is not relevant to that issue.

The only case that Plaintiff cites that would be directly relevant to the issue here is
Commerce's remand results in the *POSCO* litigation.  Pl. Br. 12.  Plaintiff, however, overlooks
the fact that Commerce applied fundamentally the same methodology for assessing whether the
setting of government prices was consistent with market principles in that case as in this case,
and Commerce's remand results were upheld by this court.  *See Final Results IDM* at 15-16
(P.R.213); *POSCO v. United States*, 556 F. Supp. 3d 1364, 1370-71 (Ct. Int'l Trade 2022).  As
Commerce explained in the *Final Results IDM*, the analytical framework that it employed in this
case is consistent with its analysis of KEPCO's pricing in prior cases, and thus Commerce's
practice supports its determination in this case.  *Final Results IDM* at 15-16; *see also POSCO v.
United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) (sustaining analysis of whether
electricity rates were set in accordance with market principles based on KEPCO's cost recovery);
*POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) (same).

Second, Commerce did not completely "ignore{} the prices paid by the respondents" in
favor of the "government supplier's revenue from sales to all customers."  Pl. Br. 14, 17.
Commerce confirmed that the mandatory respondents were properly placed into the appropriate
electricity consumption categories and that both companies paid the electricity prices in the rate

schedule applicable to those classifications. *Final Results IDM* at 15. Commerce then determined whether the rates charged to each classification covered the cost of supplying electricity to that tariff classification. *See Preliminary Results IDM* at 36-37 (P.R.173); Hyundai Steel Preliminary Calculation Memorandum at 5 (C.R.257/P.R.174); Dongbu Preliminary Calculation Memorandum at 6 (C.R.260/P.R.177). Because the mandatory respondents paid the same rates as the other companies within their classifications, Commerce's analysis of whether the rates were set in a manner consistent with market principles necessarily incorporated the rates paid by the respondents. *See Final Results IDM* at 17.

Plaintiff fails to acknowledge Commerce's explanation for how it would apply its tier-iii methodology when it issued the regulation. Commerce explained that it would look at how "the government price was established," or, as Commerce also phrased it, how "the government price was set." *Preamble*, 63 Fed. Reg. at 65,378. Plaintiff does not point to any evidence that the GOK set the price specifically for Hyundai Steel or Dongbu, and thus the government price in this instance is not respondent-specific. Rather, the tariff rates paid by those companies were generally applicable to the companies in their electricity consumption classifications, and the prices were established by the GOK for those classifications. Among the factors that Commerce said it might consider in a tier-iii analysis were "the government's price-setting philosophy" and "costs (including rates of return sufficient to ensure future operations)." *Id.* The Federal Circuit has upheld Commerce's use of a tier-iii analysis based on "familiar standards of cost recovery." *Nucor Corp.*, 927 F.3d at 1254. Given that the electricity rates were established for the classification instead of individual companies, it was reasonable and appropriate for Commerce to consider the GOK's price-setting philosophy and its costs as they related to each tariff classification generally in assessing whether the prices constitute adequate remuneration.

18

Commerce's methodology is a reasonable means to effectuate the statute, and it is deserving of deference. *See Ceramica Regiomontana*, 636 F. Supp. at 966.

Plaintiff also asserts that "Commerce's methodology gives governments *carte blanche* to engage in harmful cross-subsidization" and claims that the benchmarks Commerce constructed for certain electricity rates that were found to not be set in accordance with market principles demonstrates such cross-subsidization. Pl. Br. 17-18. Plaintiff's argument is largely a claim contesting the substantial evidence of Commerce's determination. As explained further in the section addressing Petitioner's other substantial evidence arguments, *infra*, Korean electricity prices (and electricity prices generally) are affected by supply and demand considerations that vary over the course of a day and certainly over the course of a year. Plaintiff's comparison of the monthly purchases of the respondents—the prices for which would be affected by specific conditions such as seasonality and the time of day when electricity was consumed—to a single, annual average cost ignores the prevailing market conditions for electricity in Korea that distort such a comparison. The statute demands that "the adequacy of remuneration shall be determined in relation to prevailing market conditions." 19 U.S.C. § 1677(5)(E)(iv). As this court has previously stated, "it would seem that setting lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'" *POSCO*, 581 F. Supp. 3d at 1281.

Moreover, Hyundai Steel and Dongbu were subject to the same rate structure as the other industrial users in their classifications, and they both purchased electricity during on-peak, mid-peak, and off-peak periods. Hyundai Steel NSA QR Exhibit NSA-2 (C.R.219/P.R.129); Dongbu NSA QR Exhibit NSA-2 (C.R.217/P.R.123). It stretches logic to conclude that the GOK is cross-

subsidizing the mandatory respondents *by charging the same prices* to other, similarly situated electricity customers.

Commerce's apples-to-apples comparison of average annual costs and average annual prices allowed it to determine that the rates paid by Hyundai Steel and Dongbu, which are the same rates paid by other companies in their classifications, were based on market principles and thus reflect adequate remuneration for the electricity provided.  Although Plaintiff "may have preferred for Commerce to have used a different analytical model," Commerce's methodology "permitted it to make the necessary statutory findings," and "it is Commerce, as the administering agency, that is to determine the analytical approach to establish whether a countervailable subsidy exists." *POSCO*, 557 F. Supp. 3d at 1301.  Commerce's methodology accordingly should be sustained.

## II.  COMMERCE'S FINDINGS REGARDING THE ADEQUACY OF REMUNERATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff further argues that Commerce's finding that some electricity prices were in line with market principles and thus conferred no benefit was unsupported by substantial evidence. Pl. Br. 18-19.  As noted above, Commerce concluded that "(1) KEPCO fully recovered costs and, by extension, did not confer a benefit; or (2) the prices for electricity resulted in a non-measureable benefit during the POR." *Final Results IDM* at 15 (P.R.213).  Plaintiff's arguments focus on the first category, i.e., those sales for which Commerce determined KEPCO covered its costs.  As the record demonstrates, Commerce collected and evaluated relevant evidence regarding whether KEPCO set electricity prices according to market principles, and its decision regarding this issue is supported by substantial record evidence.

As an initial matter, Plaintiff's arguments are largely based on objections regarding the methodology Commerce relied on in conducting its analysis.  As noted above, Commerce has

broad authority to determine which methodology to employ in its tier-iii analysis.  The Federal

Circuit has noted that a "great variety of methodologies {have been} used over time to ensure

that rates of a monopoly provider are not too low, some directly focused on value (such as 'fair

value'), some on various measures of 'cost' (which may reflect value)."  *Nucor Corp.*, 927 F.3d

at 1254-55 (*citing Verizon Commc'ns Inc. v. Fed. Commc'ns Comm'n,* 535 U.S. 467, 484-86

(2002)); *see generally Verizon*, 535 U.S. at 477-89).  Therefore, Commerce "has considerable

prima facie leeway to make a reasonable choice within the permissible range, and properly

justify its choice, based on the language and policies of the countervailing duty statute as well as

practicality and other relevant considerations."  *Nucor Corp.*, 927 F.3d at 1255.  Again, just

because Plaintiff "may have preferred for Commerce to have used a different analytical model"

does not mean that Commerce's conclusions are unsupported by substantial evidence.  *POSCO*,

557 F. Supp. 3d at 1301.  For the reasons discussed below, Plaintiff's arguments otherwise are

without merit.

### A. Record Evidence Demonstrates that the Korean Electricity Market Is Governed by Market Principles

Plaintiff first argues that record evidence demonstrates the Korean electricity market is

not governed by market principles.  However, an examination of the record clearly substantiates

Commerce's conclusion that it is.

As discussed in detail above, Commerce relied on a tier-iii analysis in its evaluation of

this alleged subsidy.  In accordance with 19 C.F.R. § 351.511(a)(2)(iii), Commerce will measure

the adequacy of remuneration by "assessing whether the government price is consistent with

market principles," including by reviewing "such factors as the government's price-setting

philosophy {and} costs (including rates of return sufficient to ensure future operations)."

*Preamble*, 63 Fed. Reg. at 65,378.  Commerce must also evaluate the adequacy of remuneration in relation to the prevailing market conditions.  19 U.S.C. § 1677(5)(E)(iv).

Based on these standards, Commerce has repeatedly held that electricity prices charged by KEPCO are consistent with market principles if these prices allow for the recovery of costs related to electricity generation and a profit or return on investment.[3]  This approach accords with the Federal Circuit's decisions in *Nucor* and *POSCO*.

Record evidence supports Commerce's conclusions that KEPCO's prices are in line with market principles.  In particular, record evidence establishes that the rates charged by KEPCO were set at a level that enabled KEPCO, KPX, and the six GENCOs to recover their costs of electricity generation plus a return on investment.  *See, e.g.*, *Preliminary Results IDM* at 33-34 (P.R.173).  First, Commerce noted that it had previously evaluated the applicable tariff schedule that came into effect in November 2013 and the pricing methodology that was in place during the POR and determined, based on record evidence, that both were set according to market principles.  *Id.* at 34.  After reviewing record application approval documents, cost information, and past verification reports, Commerce confirmed there were no changes to the program since

---

[3] Commerce has addressed the same issue using the same standard in multiple proceedings.  *See Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 82 Fed. Reg. 16,341 (Apr. 4, 2017), and accompanying IDM at Comment 2; *see also Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 53,439 (Aug. 12, 2016), and accompanying IDM at Comment 2; *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 4,996 (July 29, 2016), and accompanying IDM at Comment 2; *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part,* 81 Fed. Reg. 35,310 (June 2, 2016), and accompanying IDM at Comment 2; *Welded Line Pipe from the Republic of Korea: Final Negative Countervailing Duty Determination,* 80 Fed. Reg. 61,365 (Oct. 13, 2015), and accompanying IDM at Comment 1.

the issuance of its prior findings, and it thus determined that KEPCO recovered its cost of electricity generation and supply plus a return on investment for the POR. *Id.*

Second, in accordance with the recent Federal Circuit decisions in *Nucor* and *POSCO*, Commerce also considered the prices that KPX charged to KEPCO in its analysis of whether electricity was provided for less than adequate remuneration. *Preliminary Results IDM* at 34 (P.R.173). Specifically, Commerce "evaluated the marginal and capacity price and adjusted coefficient under a Tier 3 analysis." *Id.* at 35. It concluded, based on this evaluation, that KPX's prices were sufficient to cover costs and rate of return and, thus, provided no benefit.

Finally, Commerce closely reviewed details about the GENCOs' reported profits and losses during the POR. In its review, Commerce considered the GENCOs' income statements and financial statements, the GOK's explanation regarding [

],

and detailed information regarding the GENCOs' actual profit/loss information related to electricity activities [                                            ]. *See* GOK 1st NSA SQR at 9-11 (C.R.201/P.R.106); GOK 2nd NSA SQR at 9-13, Exhibits E-25, E-27 (C.R.238-239/P.R.146); GOK 3rd NSA SQR at 6-7 (C.R.242/P.R.149); GOK 4th NSA SQR Exhibit E-33 (C.R.255/P.R.169). Based on its review of the GENCOs' financial performance, Commerce concluded that the GENCOs, too, recovered their costs and a rate of return in 2019. *Preliminary Results IDM* at 34-35 (P.R.173). As a result, it is clear that Commerce thoroughly analyzed the information on the record and that there is substantial evidence supporting its determination that KEPCO set electricity prices in accordance with market principles.

In its brief, Plaintiff argues otherwise. However, not only does Plaintiff fail to establish that Commerce might have drawn another conclusion from the record evidence (which would be

insufficient to require Commerce to reverse its decision, as "the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce}'s finding from being supported by substantial evidence," *Consolo*, 383 U.S. at 620 (citations omitted)), Plaintiff fails to identify facts that suggest Commerce *could* have made another decision.  Instead, Plaintiff erroneously focuses on irrelevant facts in an attempt to suggest the Korean electricity market generally is not governed by market principles.

Plaintiff begins its argument by comparing Korea's energy usage to that of other developed countries and describing the high energy intensity of the Korean economy, noting that the industrial sector accounts for over half of the total energy consumption.  Pl. Br. 19.  However, Plaintiff provides no explanation as to how these alleged facts are relevant to the issue at hand.  These facts do nothing to establish whether the prices charged by the government were set in accordance with "market principles," as they do not address factors such as "the government's price-setting philosophy {or} costs (including rates of return sufficient to ensure future operations)."  *Preamble*, 63 Fed. Reg. at 65,378.  Further, focusing on a comparison of Korea's energy market vis-à-vis other energy markets in the world completely ignores the "prevailing market conditions" within the Korean market itself, which is in direct contradiction of the statute.  19 U.S.C. § 1677(5)(E)(iv).

Plaintiff then goes into a lengthy discussion regarding how the electricity market in Korea is owned, operated, directed, and controlled by the government through KEPCO.  Pl. Br. 19-21.  Again, however, this is completely irrelevant to Commerce's analysis regarding this issue, as this discussion in no way undermines Commerce's determination that KEPCO's electricity prices are set in accordance with market principles.  Even assuming that Korea's electricity market is "controlled" by the government (which the GOK does not concede), this

would not establish that KEPCO is providing electricity for LTAR.  As stated above, the tier-iii

methodology is used precisely in such situations—i.e., where the government is the sole provider

of a good or service.  A tier-iii analysis is necessary *because* the mere fact that the government is

the sole supplier in a market does not in and of itself lead to the conclusion that the prices within

the market are inconsistent with market principles.  A proper assessment of prices charged, as

described above, is required to determine compliance with market principles.  Commerce did

that here.  Regardless of the level of GOK involvement in the electricity market, the key fact

remains that the electricity tariffs were sufficient for KEPCO and the GENCOs to cover their

costs plus a return on capital.

Thus, Commerce has properly reviewed the evidence on the record, and its conclusion

that certain electricity prices were in line with market principles and therefore conferred no

benefit is supported by substantial evidence.  Plaintiff's argument otherwise is without merit.

### B.        The Costs Upon Which Commerce Relied Are Not Tainted

Plaintiff next takes issue with Commerce's evaluation of the cost dataset on the record,

asserting that the cost data provided by the GOK do not "reflect the actual costs of electricity

generation and supply," and arguing that Commerce's reliance on the reported data was therefore

erroneous.  Pl. Br. 22.  Again, however, Commerce's determination that cost data submitted by

the GOK reflect the actual cost of electricity generation and supply is supported by substantial

evidence on the record.

Record evidence establishes that KEPCO and the six GENCOs cover their costs plus a

sufficient rate of return.  Commerce examined KEPCO's costs and was "able to trace the costs

and the rate of return" submitted by the GOK.  *Preliminary Results IDM* at 36 (P.R.173).

Further, as explained above, Commerce separately reviewed the financial results of the six

GENCOs during the POR and concluded that the GENCOs recovered their costs.  *Id.* at 34-35.

Moreover, Commerce found that KPX's standardized price setting methodology, which applies to all electricity generators in Korea, considers both the fixed and variable costs of generating electricity and "includes consideration of the GENCO's and KEPCO's rate of return." *Id.*; *see also* GOK NSA QR at 24-26 (C.R.222/P.R.130) (establishing that the rate of return is allocated between KEPCO and the GENCOs). Commerce therefore concluded that the pricing system used by KPX establishes prices in line with market principles because the price levels are set to cover the cost of electricity generation and distribution plus a return on investment for KEPCO and the six GENCOs. *Preliminary Results IDM* at 35. In this way, Commerce's conclusion is supported by substantial record evidence.

Plaintiff takes issue with Commerce's analysis, claiming that "cost data that the GOK provided . . . does not reflect the actual costs of electricity generation and supply." Pl. Br. 22. This position is unfounded. As an initial matter, Plaintiff inaccurately asserts that Commerce failed to collect information regarding the actual cost of generation and supply from the generators themselves, and—instead—relied solely on the price mechanism establishing the prices KEPCO pays to purchase electricity through KPX in its evaluation of cost. Pl. Br. 22. This is incorrect. As discussed above, Commerce evaluated the financial position of the six GENCOs, including by gathering data in four separate questionnaire responses and considering the GENCOs' financial statements. GOK NSA QR at 3-5 (C.R.222/P.R.130); GOK 1st NSA SQR at 9-11 (C.R.201/P.R.106); GOK 2nd NSA SQR at 9-13, Exhibits E-25, E-27 (C.R.238-239/P.R.146); GOK 3rd NSA SQR at 6-7 (C.R.242/P.R.149); GOK 4th NSA SQR Exhibit E-33 (C.R.255/P.R.169). Based on this thorough evaluation, Commerce concluded that the GENCOs recovered their costs during the POR. *Preliminary Results IDM* at 34-35 (P.R.173).

Further, Plaintiff fails to cite to any evidence that suggests that these electricity prices were *not* set to cover costs plus a rate of return. Plaintiff's first argument was that KEPCO's cost datasets were based on [

]. However, this in no way establishes that the reported costs were inaccurate. Plaintiff also objects to the pricing mechanism applied by KPX, which it claims "operates in practice as an *ad hoc* reallocation of revenue based on the financial performance of KEPCO and individual generators at the time that it is established." Pl. Br. 22. This is an unsubstantiated assertion by Plaintiff that does nothing to establish that KEPCO's costs are distorted. In fact, even if true, Plaintiff's argument would be irrelevant to Commerce's analysis. Commerce's analysis focuses on whether the prices charged are sufficient to cover costs plus a rate of return; as long as this is the case, it is irrelevant how the supplying entity allocates profit. The record shows that each of the GENCOs recovered their actual costs, as did KEPCO, and the rates were set to allow KEPCO and the GENCOs a rate of return. Plaintiff identifies no evidence that suggests the cost data on the record are not accurate. Thus, given the prevailing market conditions in Korea for the generation and distribution of electricity, the retail electricity tariffs were consistent with market principles, because the tariffs fully cover the cost of electricity production and distribution plus a rate of return.

Based on the above, it is clear that Commerce has properly reviewed the evidence on the record, and its reliance on KEPCO's cost data is supported by substantial evidence. Plaintiff's argument otherwise is without merit.

## C. The Government Prices to the Respondents Reflected the Cost of Electricity Generation Plus a Return on Investment

Finally, Plaintiff claims—incorrectly—that the electricity prices paid by the respondents did not cover the cost of electricity generation. Pl. Br. 22-24. However, in making this

argument, Plaintiff distorts Commerce's benchmark analysis and completely disregards prevailing market conditions, which render Plaintiff's comparisons unreasonable.

Plaintiff suggests that a proper methodology would compare the average cost of supply for a particular tariff classification to the prices the respondents paid based on month and time of use and provides calculations that it contends demonstrate that the prices paid by the respondent companies did not cover the cost of production plus a return on investment. Pl. Br. 22-24. These calculations are fundamentally flawed. As an initial matter, and as discussed above in Section I.B, it was reasonable and appropriate for Commerce to consider in its analysis the GOK's price-setting philosophy for the *tariff classification* instead of evaluating the rates paid by individual companies given that the electricity rates were established for the classification and not for individual companies. Plaintiff disregards this fact and instead compares the rates paid by the individual companies to KEPCO's cost of supply.

Further, Plaintiff's analysis suffers from two additional flaws: first, Plaintiff inconsistently cherry-picks data to support its position; and, second, Plaintiff completely ignores prevailing market conditions in the Korean electricity market. In its analysis, Plaintiff selectively identifies Dongbu's [                    ], noting that it paid monthly off-peak prices under the [                              ] electricity rate classification of [

      ] and mid-peak prices of [                    ] in [

    ] during the POR. Pl. Br. 23. Plaintiff then concludes that these prices do not cover the costs of electricity generation as KEPCO's reported average unit cost of supply for this electricity rate classification was [                    ]. *Id.* Plaintiff's analysis of the prices charged for supplying electricity to Hyundai Steel's [                  ] similarly considers only the [       ] off- and mid-peak prices to argue that these prices did not sufficiently cover KEPCO's

28

reported average unit cost of supply for this electricity rate classification (i.e., [

] ).  Pl. Br. 23.

This court has already concluded that Nucor's price comparisons relying on cherry-picked data are insufficient to establish that Commerce's analysis or conclusions are not supported by substantial evidence:

> Nucor's price comparison also lacks merit.  Nucor seeks to compare the lowest monthly average off-peak price paid by the respondents for certain months of the POI to the lowest annual average unit price paid to a KEPCO generator. . . . Given that the KPX set prices on an hourly basis . . . , Nucor's inconsistent cherry-picking of data fails to demonstrate that the respondents paid less for their respective electricity consumption than was necessary to allow the generators to recover the costs of supplying that electricity and it does not call into question Commerce's analysis or conclusions.

*POSCO*, 557 F. Supp. 3d at 1300-01.  In the instant case, however, Nucor's comparisons are even worse: again, Nucor focuses on the [          ] off-peak and mid-peak prices, but then compares these prices to KEPCO's average costs for supplying electricity to all customers within the relevant classification at all times of day for the entire year.  This Court should continue to conclude that Nucor's price comparison in this case is unpersuasive.

Further, it is nonsensical to compare an *average* cost to time-specific prices established based on varying costs of production, and doing so fails to take into account the prevailing market condition in the Korean electricity market.  As electricity is consumed immediately rather than being stored, the relationship between supply and demand is heavily affected by seasonality and the time of day.  As explained in KEPCO's Form 20-F, KPX's pricing formula takes into account the "marginal price of electricity *at a given hour* at which the projected demand for electricity and the projected supply of electricity for such hour intersect."  GOK NSA QR at Exhibit E-1, p. 36 (C.R.222/P.R.146) (emphasis added).  When demand is low, KEPCO sources electricity for distribution from the lowest-cost generators (e.g., nuclear or coal), thereby

29

meriting a lower price to the downstream customers; when demand is high, KEPCO has to source electricity from higher-cost generators as well (e.g., oil and/or LNG), thereby requiring a higher price from its downstream customers.  *Id.*  In turn, the tariff rates charged by KEPCO take these prevailing market conditions regarding the cost of generation and demand into account by establishing different tariff rates based on the time of day and seasonality.  *Id.* at Exhibit E-9.  Therefore, if Commerce were to rely on the comparison suggested by Plaintiff, it would be ignoring prevailing market conditions in the Korean electricity market in a way that contravenes the statute.[4]

The data on the record allowed Commerce to compare the revenue generated from the tariffs charged to companies within a classification against the annual average cost for supplying electricity to that tariff classification.  This comparison accounts for the prevailing market conditions in Korea, as it incorporates the average cost for generating and distributing electricity for all times of day for all periods of the year to the average revenue generated from supplying electricity at the applicable rates at all times of day for all periods of the year.  The comparison also reflects how the tariff rates were set, which was for classifications instead of individual companies.  As explained, Commerce has discretion in choosing how to measure the adequacy of remuneration, and the methodology chosen in this case, which ensures an apples-to-apples comparison between costs and revenues, was reasonable.

Even if it were appropriate to use the specific purchases of the mandatory respondents in the comparison to KEPCO's average classification-wide costs, notwithstanding the lack of

---

[4] As explained above in Section I.B, Petitioner's comparison of the mandatory respondents' monthly purchases, which are impacted by seasonality and the time of day that the companies consumed electricity, to KEPCO's annual average costs for supplying all consumers within the tariff classification suffers from the same flaws.  *See* Pl. Br. 17-18.

comparability given that any individual company would have unique energy consumption
patterns with respect to time of day and year, a more accurate analysis would compare KEPCO's
reported average unit cost to supply electricity to the relevant tariff classification (i.e., **[**

**]**) with the average unit price that Dongbu's **[**                          **]** paid for the full POR
(i.e., **[**                          **]**).  Dongbu NSA QR Exhibit NSA-2 (C.R.217).[5]  Similarly, a more
accurate analysis would compare KEPCO's reported average unit cost of supply for the relevant
tariff classification (i.e., **[**                          **]**) with the average unit sale price that Hyundai
Steel's **[**                          **]** paid during the full POR (i.e., **[**                          **]**).  Hyundai Steel NSA
QR Exhibit NSA-2 (C.R.220).[6]  These comparisons, which at least put the costs and revenues on
a similar basis (i.e., for the full year and for all times of day), demonstrate that the prices charged
by KEPCO were sufficient to cover its costs, plus additional profit.

Finally, Plaintiff claims record evidence suggests that "KEPCO has structured its
electricity prices to maintain subsidies to large industrial users like steel producers, while
recouping losses on those sales through higher prices to other users."  Pl. Br. 23; *see also* Pl. Br.
17-18.  Commerce rightly found that "there is no basis to conclude that this is taking place."
*Final Results IDM* at 19.  The GOK has repeatedly demonstrated—and Commerce has
repeatedly found—that KEPCO's revenue on sales of electricity is sufficient to cover costs
(including the cost of electricity generation) *and a return on investment* for each tariff
classification.  *See Preliminary Results IDM* at 36 (P.R.173) ("We examined the above process
and were able to trace the costs and the rate of return to KEPCO's submitted cost data through to

---

[5] The average unit sale price was calculated by dividing the total of KRW/kWh for all monthly
prices (i.e., off-, mid-, and on-peak prices) under **[**                                        **]**
electricity rate class by the total number of months (i.e., 36 months).

[6] The average unit sale price was calculated in the same manner as described above.

its recovered costs for each tariff classification.").  And the mandatory respondents were subject to the same electricity rates as the other companies in their respective classifications.  *Final Results IDM* at 15.  To the extent that the mandatory respondents paid less for electricity during particular times of the day or certain months of the year than during other periods, this court has rejected such pricing as evidence of cross-subsidization, explaining that "it would seem that setting lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'"  *POSCO*, 581 F. Supp. 3d at 1281.  Moreover, Plaintiff's theory that KEPCO sells at a loss to "large industrial users" while recouping those losses through sales to other customers is contradicted by the fact that KEPCO's

[

].  GOK NSA QR at 16, Exhibit E-9 (C.R.222-224/P.R.130); GOK 1st NSA SQR Exhibit E-17.1 (C.R.232/P.R.140).

Thus, notwithstanding Plaintiff's assertions to the contrary, record evidence demonstrates that the prices charged by KEPCO were above its reported costs of supply for the tariff classes and were sufficient to cover costs (including the cost of electricity generation) plus the return on investment.  Therefore, substantial evidence supports Commerce's conclusion, and Plaintiff's arguments are without merit.

**<u>CONCLUSION</u>**

For the reasons discussed above, the challenged aspects of Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  The Court therefore should sustain Commerce's decisions therein.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: October 7, 2022                *Counsel for the Government of the Republic of Korea*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that

forgoing Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record,

dated October 7, 2022, complies with the word-count limitation set forth in the Court's

Chambers Procedures 2(B)(1).  The memorandum of law contains 9,795 words according to the

word-count function of the word-processing software used to prepare the memorandum.


Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
Dated: October 7, 2022          *Counsel for the Government of the Republic of Korea*

1