NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

NUCOR CORPORATION,

                    Plaintiff,

          and

STEEL DYNAMICS, INC.,

                    Plaintiff-Intervenor,

          v.

UNITED STATES,

                    Defendant,

          and

HYUNDAI STEEL COMPANY and
GOVERNMENT OF THE REPUBLIC
OF KOREA,

                    Defendant-Intervenors.

Before:  Hon. Jennifer Choe-Groves,
          Judge

Court No. 22-00050

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 18-20

<u>**PLAINTIFF NUCOR CORPORATION'S REPLY BREIF**</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: November 4, 2022

Ct. No. 22-00050                                      **NON-CONFIDENTIAL VERSION**

<u>**TABLE OF CONTENTS**</u>

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT .........................................................................................................1

     A.     The Federal Circuit Has Not Endorsed Commerce's Unlawful Analysis ...............................................................................1

     B.     Commerce's Determination that the Government Price Was Consistent with Market Principles Was Unlawful.................................4

           1.     Commerce Unlawfully Ignored the Government Price to the Respondents in Determining Whether a Benefit Exists ...................................................................4

           2.     The Tier Three Rule Does Not Free Commerce from the Requirements of the Adequate Remuneration Standard ...............................................................................8

           3.     The Final Results Do Not Reflect a Necessary or Well-Established Tier Three Methodology .................................11

     C.     The Final Results Were Unsupported by Substantial Evidence...............................................................................................17

III.    CONCLUSION....................................................................................................22

Ct. No. 22-00050                                    NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962)..................................................................21

*ClearCorrect Operating, LLC v. Int'l Trade Comm'n*,
    810 F.3d 1283 (Fed. Cir. 2015)..................................................10

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)..................................................................17

*Kisor v. Wilkie*,
    139 S.Ct. 2400 (2019)..................................................9, 10, 11, 17

*Nucor Corp. v United States*,
    No. 21-00182, slip op. 22-116 (Ct. Int'l Trade Oct. 5, 2022)................16

*Nucor Corp. v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019)..................................................1, 2, 9

*POSCO v. United States*,
    977 F.3d 1369 (Fed. Cir. 2020)..................................................1, 3, 18

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)..................................................10, 16

*Sorenson v. Sec'y of Treasury of U.S.*,
    475 U.S. 851 (1986)..................................................................10

*U.S. Steel Corp. v. United States*,
    33 CIT 1935 (2009) ..................................................................9

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
    471 F.Supp.3d 1313 (Ct. Int'l Trade 2020) ..................................20

**Statutes**

19 U.S.C. § 1677f-1(e)..................................................................4, 11

19 U.S.C § 1677(E)..................................................................4

19 U.S.C. § 1677(5A)..................................................................7

19 U.S.C. § 1677(5)(E)..................................................................11

**NON-CONFIDENTIAL VERSION**

**Regulations**

19 C.F.R. § 351.503(b) ..................................................................................11

19 C.F.R. § 351.503(b)(1) ..........................................................................4, 11

19 C.F.R. § 351.511(a)(2)(iii) ....................................................................9, 10

19 C.F.R. § 351.511(b) ................................................................................11

Ct. No. 22-00050                                    NON-CONFIDENTIAL VERSION

## I.   <u>INTRODUCTION</u>

On behalf of Nucor Corporation ("Nucor"), we hereby submit the following brief in reply to the response briefs of Defendant the United States and Defendant-Intervenors Hyundai Steel Company ("Hyundai Steel") and the Government of Korea ("GOK").  Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R. (Oct. 7, 2022), ECF No. 38 ("Def. Resp. Br."); Def.-Int. Gov't of the Republic of Korea's Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. (Oct. 7, 2022), ECF No. 40 ("GOK Resp. Br."); Def.-Int. Hyundai Steel's Br. in Opp'n to Pl.'s Mot. for J. on the Agency R. (Oct. 7, 2022), ECF No. 36 ("Hyundai Steel Resp. Br.").  Nucor respectfully requests that the Court find the arguments of Defendant and Defendant-Intervenors unpersuasive and hold that the Department of Commerce's ("Commerce") final results of the 2019 administrative review of *Certain Corrosion-Resistant Steel Products from the Republic of Korea* were unsupported by substantial evidence and otherwise not in accordance with law.  *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022), P.R. 216 ("Final Results").

## II.   <u>ARGUMENT</u>

### A.   <u>The Federal Circuit Has Not Endorsed Commerce's Unlawful Analysis</u>

Defendant and Defendant-Intervenors mischaracterize the Federal Circuit's holdings in *Nucor* and *POSCO*.  *Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019); *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020).  Defendant asserts that "the Federal Circuit upheld {the agency's} approach in *Nucor v. United States* . . . and did not question it in *POSCO v. United States* . . . other than to require Commerce to examine both KEPCO and KPX, which Commerce did here."  Def. Resp. Br. at 19.  Defendant-Intervenors make similar assertions.  GOK Resp. Br. at 18, 22; Hyundai Steel Resp. Br. at 19.  While the Federal Circuit's holdings in *Nucor* and

*POSCO* are significant with respect to the interpretation of "adequate remuneration" in the statute and thus the meaning of the agency's adequate remuneration rule, neither case squarely addressed the questions before this Court.  The *Nucor* and *POSCO* opinions certainly did not "affirm" anything that Commerce did in the Final Results.

The analysis that Commerce applied in the Final Results is not the same analysis that it applied in the original investigations under review in *Nucor* and *POSCO*.  In those cases, t Commerce applied a "standard pricing mechanism" analysis, under which, "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity, then there is no benefit." Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) at 18 ("CORE OI IDM"). Per Commerce, this preferentiality analysis alone was "sufficient to support a finding that no benefit is conferred." *Id.* at 20.  *See also id.* at 21. *Nucor* held that Commerce's position that an analysis of preferential rates was sufficient to support a finding of adequate remuneration was "beyond any reasonable interpretation of the statute, or of its implementing regulation." *Nucor*, 927 F.3d at 1249.

Regarding Commerce's purported cost recovery finding in the investigation, Nucor argued that Commerce erred by limiting its analysis of KEPCO's costs to KEPCO's cost of purchasing electricity through the Korea Power Exchange ("KPX") – *i.e.*, that Commerce could not simply presume that the value of KEPCO's reported costs reflected a market-based value that could be used in a cost recovery determination. *See id.* at 1255-56. The *Nucor* majority declined to consider this argument on exhaustion grounds. *Id.  But see id.* at 1258-62 (Reyna, J., dissenting).  No such

exhaustion defense was raised in *POSCO*, where the court incorporated the *Nucor* court's holdings regarding the preferential rates standard and remanded Commerce's analysis of KEPCO's costs for failing to thoroughly account for the role of the KPX and the costs of electricity generation and supply. *POSCO*, 977 F.3d at 1375-78. Review of Commerce's remand redetermination pursuant to *POSCO* remains pending before the Federal Circuit.

Commerce articulated a different methodology in the Final Results. Instead of applying the "standard pricing mechanism" framework, it considered whether the government price is consistent with market principles because it "cover{s} both cost recovery and a rate of return." Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) at 16, P.R. 213 ("Final Decision Memo"). Unlike *Nucor* and *POSCO*, where Commerce analyzed government prices for qualitative consistency with a "standard pricing mechanism," the Final Results here sought to apply a quantitative comparison between two numbers – a "cost-plus-profit" value and a "price." Commerce's analysis here may be more "consistent with its approach in the <u>*POSCO*</u> <u>remand</u>," Def. Resp. Br. at 21 (emphasis added), but the Federal Circuit has not sustained those remand redeterminations.

Here, Nucor continues to challenge Commerce's conclusions regarding the value of KEPCO's reported <u>costs</u>, which the Federal Circuit in *POSCO* remanded as unlawful and unsupported by substantial evidence. *See* Pl. Nucor Corp.'s Rule 56.2 Mot. for J. on the Agency R. (July 25, 2022), ECF No. 34 at 21-22 ("Nucor Br."); Letter from Wiley Rein LLP, re: *Case Brief* (Aug. 26, 2021) at 2-3, 5-6, C.R. 264, P.R. 196 ("Nucor Case Br."). Nucor also challenges the <u>price</u> side of Commerce's analysis. Nucor Br. at 12-18; Nucor Case Br. at 9-12. This additional argument is that Commerce may not determine whether the government <u>price</u> represents a market-

based, cost-plus-profit price based on KEPCO's total unit sales revenues on all sales to all customers.  Instead, the determination must be based on the government <u>price to the respondent</u>. The Federal Circuit did not address this issue.

### B.   <u>Commerce's Determination that the Government Price Was Consistent with Market Principles Was Unlawful</u>

#### 1.   <u>Commerce Unlawfully Ignored the Government Price to the Respondents in Determining Whether a Benefit Exists</u>

Commerce's determination that KEPCO's prices were consistent with market principles where total unit revenues on all sales in a particular tariff classification covered KEPCO's reported cost of supply was unlawful.  The statute requires Commerce to determine "individual countervailable subsidy rate{s}," 19 U.S.C. § 1677f-1(e), and to find that a benefit is conferred "where there is a benefit <u>to the recipient</u>," *id.* § 1677(E) (emphasis added).  This determination should be made with "reference to what <u>the recipient</u> would have had to pay for the . . . good . . . in the marketplace, absent any government involvement."  *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,193 (Dep't Commerce Aug. 17, 2001) (emphasis added).  This is different from determining benefit based on whether there is a cost to the government in bestowing the subsidy, which "is wholly inappropriate from the perspective of the <u>private recipient</u>."  *Id.* (emphasis added).  The statute and Commerce's practice thus focus the analysis on the effect of a government financial contribution on the experience of the individual exporters or producers under investigation or review.

Commerce's regulations do the same.  The general rule regarding the benefit conferred by subsidies is that Commerce "normally will consider a benefit to be conferred where <u>a firm pays</u> less for its inputs . . . than it otherwise would pay . . . ."  19 C.F.R. § 351.503(b)(1) (emphasis

NON-CONFIDENTIAL VERSION

added).  Each "tier" of Commerce's "adequate remuneration" rule refers to "the government price," *id.* § 351.511(a)(2)(i)-(iii), and neither Defendant nor Defendant-Intervenors dispute that "the government price" refers to the government price actually paid by the respondents under tiers one and two.  Here, Commerce unlawfully determined whether a benefit exists based on KEPCO's total unit revenues on all sales under an electricity tariff classification, without regard to the government price actually paid by the respondents.  Nucor Br. at 14-18.

Both Defendant's and Defendant-Intervenors' responses to Nucor's arguments are unpersuasive.  Defendant and Defendant-Intervenor Hyundai Steel accuse Nucor of quoting the rule that Commerce articulated in the *POSCO* remand results out of context.  *Id.* at 20-21; Hyundai Steel Resp. Br. at 8.  Neither, however, explains how the "context" that they provide changes the meaning of the rule as Nucor quoted it.  Nucor quoted the rule as follows: "If the tariff charged to the respondent does not cover 'cost of production' plus a 'profitable return on the investment' . . . then the respondent has received a countervailable benefit under section 771(5)(E) of the Act." Nucor Br. at 2, 12.  This is a clear "if-then" proposition that is not qualified by any of the surrounding language that Defendant provides.  Def. Resp. Br. at 21.

Hyundai Steel suggests That the "key part" of the sentence is the clause: "{W}hich is the same standard set forth in KEPCO's standard pricing methodology."  Hyundai Steel Resp. Br. at 13.  Again, it is unclear how this alters the substance of the rule that Commerce articulated.  This rule was that "{i}f the tariff charged to the respondent does not cover 'cost of production' plus a 'profitable return on the investment' . . . then the respondent has received a countervailable benefit . . . ."  This may be "the same standard set forth in KEPCO's standard pricing methodology," but that alone does not answer the relevant empirical question.  Did the tariff charged to the respondent . . . cover the 'cost of production plus a profitable return on the investment?  If not, then a benefit

has been conferred.  Answering that question based solely on "the standard set forth in KEPCO's standard pricing methodology," without a proper empirical comparison, is akin to finding that a subsidy confers no benefit simply because the foreign government says so.

Defendant's and Defendant-Intervenors' responses on this point are also rife with equivocation.  Defendant highlights the fact that Commerce's analysis "evaluat{ed} the electricity prices to see if they <u>allow for</u> the recovery of costs, plus a rate of recovery or profit."  Def. Resp. Br. at 20 (emphasis added).  *See also*   GOK Resp. Br. at 22;Hyundai Steel Resp. Br. at 13.  The question, however, is not whether KEPCO's broader pricing methodology "allows" or "permits" it to recover costs as a conceptual matter.  The question, as presented by Commerce itself, is whether as an empirical matter the prices charged to the respondents cover{ed} the cost of production and supply plus an amount for profit.  As Nucor demonstrated in its opening brief, in this case they did not.  Nucor Br. at 22-24.  Commerce's conclusion to the contrary was not in fact based on KEPCO's <u>prices</u> at all.  *Id.* at 16.

Neither Defendant nor Defendant-Intervenors address the fact that Commerce's determination was not based on "the government price," as the regulation requires, but on KEPCO's total annual unit revenues on all sales to all customers under the relevant tariff classification. *Id.* at 15-16.  Instead, they suggest that basing the determination on KEPCO's total unit revenue <u>was</u> an analysis of KEPCO's "prices" because the respondents "paid electricity prices that are charged to all companies in the corresponding electricity consumption classification . . . ." Def. Resp. Br. at 23.  *See also* GOK Resp. Br. at 18; Hyundai Steel Resp. Br. at 13.

It is undisputed that the respondents paid for electricity based on prices in KEPCO's tariff schedule, but emphasizing this undisputed fact is a red herring.[1]   Commerce did not consider whether any prices, either those listed in KEPCO's tariff schedule or those reported in respondents' questionnaire responses, covered KEPCO's cost of production plus an amount for profit.   *See* Nucor Br. at 16.   It considered only KEPCO's total unit sales revenues from all sales to all customers under the respective tariff classifications.   This number did not resemble either the prices listed in KEPCO's tariff schedule, or the prices that the respondents reported actually paying.   *Id.*   If anything, Commerce's analysis means only that there was no cost to KEPCO in structuring its electricity prices the way that it did, but this analysis is "wholly inappropriate from the perspective of the private recipient."   *Softwood Lumber from Canada* at 43,139.   It says nothing about whether there was a "benefit to the recipient," as the statute requires.   19 U.S.C. § 1677(5)(E).

Only Defendant-Intervenor Hyundai Steel attempts to address Commerce's analysis in the context of the "benefit to the recipient" standard set forth in the statute.   Hyundai Steel states only that Commerce's methodology determines whether there was a benefit to the recipient because "Commerce will calculate a benefit and assign it to the respondent recipient . . . ."   Hyundai Steel Resp. Br. at 18-19.   This, however, refers only to the way in which Commerce calculated the benefit amount, not to the way it determined whether a benefit exists.   The latter is the threshold

---

[1]      The GOK also suggests that this appeal has something to do with how Commerce may or may not have determined that the provision of electricity for LTAR is specific, had it reached the issue of specificity in the Final Results.   GOK Resp. Br. at 18.   But Commerce did not reach the issue of specificity, so that issue is not before the Court.   It is unclear how Nucor's argument turns on whether Commerce would have found the provision of electricity for LTAR to be respondent-specific or specific for one of the many other reasons enumerated in the statute.   19 U.S.C. § 1677(5A).

question that is before the Court.  To answer that question, Commerce applied a "cost to the government" standard that finds no benefit provided that the government supplier does not incur losses on its sales to <u>all</u> customers.  That analysis <u>does</u> "completely ignore the prices paid by the respondents in favor of the government supplier's revenue from sales to all customers."  GOK Resp. Br. at 17-18.  It considers only the broader financial performance of the government supplier, which both Commerce and courts have considered irrelevant to an adequate remuneration determination.  Nucor Br. at 17.

> **2.     The Tier Three Rule Does Not Free Commerce from the Requirements of the Adequate Remuneration Standard**

Defendant and Defendant-Intervenors attempt to distinguish the authorities that Nucor cited, or to characterize them as inapplicable to a tier-three adequate remuneration analysis.  Def. Resp. Br. at 21-23; GOK Resp. Br. at 15-17; Hyundai Steel Resp. Br. at 14-15, 16-18.  While Defendant is silent with respect to the statutory and regulatory provisions that focus Commerce's subsidy investigations on the individual experience of the respondents under consideration, *see* Def. Resp. Br. at 18-24, Hyundai Steel describes them as a "nonsensical . . . hodgepodge" of provisions.  Hyundai Steel Resp. Br. at 14.  According to the GOK, the provisions "do not address how Commerce is to determine whether goods "are provided for less than adequate remuneration . . . when assessing whether the government price is consistent with market principles under the tier-iii methodology . . . ."  GOK Resp. Br. at 15.  Defendant and Defendant-Intervenors all suggest that the agency and court decisions cited by Nucor are inapplicable to the extent that they involve determinations under tier one or tier two of the agency's adequate remuneration rule.  Def. Resp. Br. at 21-22; GOK Resp. Br. at 16-17; Hyundai Steel Resp. Br. at 16-17.

These arguments should be rejected because the tier three rule does not exist in a legal vacuum.  The basic rules and principles applicable to adequate remuneration, and to Commerce's countervailing duty proceedings more broadly, continue to exist in the tier three context.  As the Federal Circuit explained in *Nucor*, the tier three rule is part and parcel of what must be read as a coherent regulatory framework under the same statutory standard.  *See Nucor*, 927 F.3d at 1253 ("The above-stated meaning of 'market principles' sensibly treats the three {regulatory} methods as all of a piece, because the two primary methods of implementing the statutory standard rely on competitive-market prices, which . . . are tied to 'fair value.'") (emphasis added).  As a result, if the broader financial performance of the government supplier "does not demonstrate that its prices . . . are market-based," *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) (emphasis added), and if it is otherwise "not relevant to the determination of whether {an input} was sold for {adequate remuneration}," Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) at 65 (emphasis added), then that must be true for all three tiers of Commerce's rule.

The same is true with respect to the requirement that Commerce determine whether "the government price" is for adequate remuneration because it is "consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).  While Hyundai Steel argues that Nucor "has a tall mountain to climb" in demonstrating error in Commerce's application of the tier three rule, Hyundai Steel Resp. Br. at 11, it does so based on "a caricature of the doctrine {of *Auer* deference}, in which deference is reflexive." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019).  *See also* Hyundai Steel Resp. Br. at 12 (stating that "Commerce's interpretation of its own regulations 'must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'").  While

Hyundai Steel implies that "agency constructions of rules receive greater deference than agency constructions of statutes," *Kisor*, 139 S.Ct. at 2416, the Supreme Court has clarified that "that is not so.   Under *Auer*, as under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation.'  And let there be no mistake: That is a requirement an agency can fail." *Id.*

As a preliminary matter, "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous" after it "exhaust{s} all the 'traditional tools' of construction." *Id.* at 2415. *See also ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1290 (Fed. Cir. 2015) ("If the . . . language is plain, we must enforce it according to its terms. . . .{W}hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.").  Here, the regulation is unambiguous.  The rule may not lay out an explicit methodology, but it is quite explicit with respect to <u>what</u> must be "consistent with market principles."   That is the "government price," and not the government supplier's revenues on all sales to all customers.  19 C.F.R. § 351.511(a)(2)(iii).

It is also clear from the immediate context of the tier three rule that "the government price" means the government price <u>to the respondent</u>.   Again, neither Defendant nor Defendant-Intervenors dispute that "the government price" under the tier one and tier two rules refers to the government price to the respondent.  Because "identical words used in different parts of the same act are intended to have the same meaning," the tier three rule's reference to "the government price" must also mean the government price to the respondent. *See, e.g.*, *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986).  "This is particularly so because the {three} provisions are directed to the same calculation . . . ." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

NON-CONFIDENTIAL VERSION

The clear meaning of "the government price" is confirmed by the tier three rule's place within the broader statutory and regulatory scheme.  First, the general "benefit" rule is that Commerce "normally will consider a benefit to be conferred where <u>a firm pays</u> less for its inputs . . . than it otherwise would pay in the absence of the government program," 19 C.F.R. § 351.503(b), not where <u>a government supplier earns</u> less than it otherwise would on its combined sales of inputs.  This general rule tracks Commerce's interpretation of "adequate remuneration" elsewhere.  *See, e.g.*, *Softwood Lumber from Canada* at 43,193 ("{T}he true measure of the benefit derived from any government largesse is by reference to what <u>the recipient</u> would have had to pay for the physical or financial good or service in the marketplace, absent any government involvement.") (emphasis added).  The adequate remuneration rule itself clarifies that Commerce "normally will consider a benefit as having been received as of the date on which <u>the firm pays</u> . . . for the government-provided good or service."  19 C.F.R. § 351.511(b) (emphasis added).  The statute, in turn, directs Commerce to determine whether there is a "benefit to <u>the recipient</u>," and to determine "<u>individual</u> countervailable subsidy rates."   19 U.S.C §§ 1677(5)(E), 1677f-1(e) (emphasis added).  This is not an irrelevant "hodgepodge" of provisions, as Hyundai Steel suggests.  It is necessary context for Commerce's rule that allows the Court to "perform {its} reviewing and restraining {function}" with respect to Commerce's determination.  *Kisor*, 139 S.Ct. at 2415.

### 3.     The Final Results Do Not Reflect a Necessary or Well-Established Tier Three Methodology

Notwithstanding the clear requirements of the agency's rule in the context of the statute and regulations, Defendant suggests that it was not only reasonable, but necessary for Commerce to revert to an analysis of the government supplier's overall revenues in its tier three analysis.

NON-CONFIDENTIAL VERSION

Defendant posits that "{i}t is unclear how Commerce could determine that the 'the government price is consistent with market principles' <u>without</u> examining 'the aggregate performance of the government supplier.'" Def. Resp. Br. at 22-23.  According to Defendant, in a tier three analysis, "Commerce is necessarily without the benefit of 'market-determined' or 'world market' prices to which it can compare the prices paid 'by the respondent.'" *Id.* at 23.  This ignores both Commerce's findings in Final Results, and the agency's practice in other tier three cases.


Commerce first determined that its "prior evaluation of KPX's electricity prices and record information demonstrate that there is a pricing mechanism in place for KEPCO to acquire electricity that does not confer a benefit" because it "reflect{s} the costs of electricity generation and supply and should continue to be the basis of our analysis." *Id.* at 18.  *See also* Preliminary Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products form the Republic of Korea*, 86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) at 34-35, P.R. 173 ("Prelim. Decision Memo") (determining that KEPCO's cost of acquisition through the KPX was based on a cost-plus-profit price that was consistent with market principles).  Contrary to the premise of Defendant's argument, then, Commerce <u>did</u> have a benchmark that it determined was consistent with market principles because it represented the cost of supplying electricity plus an amount for profit.

Having determined that KEPCO's reported cost of supply represented a cost-plus-profit price that was consistent with market principles, however, Commerce did not simply compare this benchmark to the prices actually paid by the respondents, as Nucor argued that it should in the absence of other information.  Nucor Case Br. at 6-9.  Instead, to determine whether a benefit exists, Commerce compared KEPCO's reported cost of supply by tariff classification to KEPCO's

total unit revenues by tariff classification, with no reference whatsoever to the prices in KEPCO's

tariff schedule or to the prices that the respondents reported paying.  Prelim. Decision Memo at

36-37 (unchanged in final results).

For this part of Nucor's appeal,[2] then, the issue is not the existence or the availability of

benchmarks in tier three cases, as Defendant suggests.  The issue is Commerce's failure to use the

cost-plus-profit benchmark that it identified to evaluate the benefit conferred by "the government

price."   In numerous tier-three cases, Commerce has identified benchmark prices, including

benchmark prices derived from third-country data, and it has compared those benchmark prices to

the government price charged to the respondent to determine whether and to what extent there was

a benefit.  *Id.* at 13-14.

The GOK argues that these tier three cases are inapplicable because Commerce only

compared the respondents' prices to a benchmark after determining that the government's prices

were not consistent with market principles.  GOK Resp. Br. at 16-17.  This may be true, but that

purported distinction reflects only Commerce's inconsistent methodologies to determine whether

a government price is consistent with market principles.  It does not change the fact that Commerce

has consistently determined whether and to what extent there was a benefit based on a comparison

between a benchmark price and the prices actually paid by the respondents.

In *Cold-Rolled from Russia*, Commerce explained that "the regulations do not prescribe

any particular analysis under {tier three}," such that methodologies "must be developed on a case-

---

[2]      As explained in Nucor's Opening Brief, and elsewhere in this reply brief, Nucor has also
challenged, and continues to challenge, Commerce conclusion that KEPCO's acquisition cost
through the KPX represents a market-based cost-plus-profit price.  It accepted, however, that
KEPCO's cost as reported by the GOK was the best information available given the agency's
decision not to seek additional information.  Nucor Case Br. at 5-6.

by-case basis." Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) at 67 ("*Cold-Rolled from Russia* IDM"). It determined whether the government supplier's prices were consistent with market principles based on a qualitative assessment of government intervention drawn largely from narrative explanations in the government supplier's annual reports, not based on whether the government prices covered costs plus an amount for profit. *Id.* at 67-69. Commerce in fact declined the respondents' and foreign government's suggestion to consider "whether {the} regulated prices allow the system to recover full economic costs to sustain continuing operations" and whether there was "a price regulating philosophy that accounts for cost recovery, investment, and profit." *Id.* at 64, 66-67.

Having determined based on its qualitative assessment that the government supplier's prices were not consistent with market principles, Commerce determined whether those prices conferred a benefit to the recipient by comparing an external benchmark price to the prices actually paid by the respondents. *Id.* at 18-19. Commerce conducted a similar qualitative assessment in *Coated Free Sheet Paper from Indonesia*, before determining whether there was a benefit to the recipient by comparing a benchmark price to the price actually paid by the respondents. *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 17,498, 17,503-04 (Dep't Commerce Apr. 9, 2007) (unchanged in final).

Here, Commerce did not determine whether KEPCO's prices were consistent with market principles using a qualitative assessment of GOK intervention in the electricity market or in KEPCO's price-setting process. In fact, Commerce made effectively no reference whatsoever to the GOK's interventions in the market or its control over all aspects of the "price-setting mechanism." Final Decision Memo at 15-19. Instead, it articulated a purely quantitative standard,

NON-CONFIDENTIAL VERSION

like the one it <u>rejected</u> in *Cold-Rolled from Russia*, that a government price is consistent with market principles to the extent that it covers the government supplier's cost of supply plus an amount for profit.

   This standard more closely resembles what Commerce did in *Supercalendered Paper from Canada*, but in that case, the agency clearly determined that <u>the price actually paid by the</u> <u>respondent</u> was not consistent with market principles because <u>the price actually paid by the</u> <u>respondent</u> did not cover the government supplier's costs plus an amount for profit.  Issues and Decision Memorandum accompanying *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) at 48 ("Accordingly, we determine that the 'below-the-line' <u>Port</u> <u>Hawkesbury {rate}</u> was not set by a market-determined method" because "'below-the-line' rates do not include rates of return sufficient to ensure future operations by covering all costs and providing for profit.").  It did not, as it did here, determine that the government supplier's prices were consistent with market principles because <u>the government supplier's total revenues</u> on some broader amalgamation of sales covered costs plus profit.

   Each of these cases establishes that, under tier three as under tiers one and two, Commerce determines whether a benefit was conferred to the respondent (*i.e.*, whether there was a benefit to the recipient), based on the prices actually paid by the respondent.  Beyond that, Commerce has no "well-established" methodology for determining whether a government price is "consistent with market principles" under tier three, as Commerce has asserted.  Final Decision Memo at 15 ("We find that it is appropriate to continue to rely on our well-established tier-three methodology to analyze this program.").  *But see, e.g.*, *Cold-Rolled from Russia* IDM at 67 ("{T}he regulations do not prescribe any particular analysis under this prong.  Rather . . . the analysis . . . must be developed on a case-by-case basis.").

Hyundai Steel fails in its attempt to demonstrate otherwise.  It faults Nucor for "cit{ing} to numerous cases <u>outside of Korea</u>" and calls the Court's attention to "legions of . . . <u>Korean cases</u>" in which Commerce has purportedly applied the same tier three analysis.  Hyundai Steel Resp. Br. at 15, 17-18 (emphasis added).  Hyundai Steel's "legions of cases" in fact consist of only two cases, *Corrosion-Resistant Steel Products from Korea* and *Welded Line Pipe from Korea*.  *Id.* In both, Commerce applied tier three analyses that the Federal Circuit has found unlawful or unsupported by substantial evidence.   As explained above, in the *Corrosion-Resistant Steel* original investigation, Commerce applied an analysis identical to the one that the Federal Circuit remanded in *POSCO*.  *Infra* at 2-3.  In *Welded Line Pipe from Korea*, Commerce applied a "standard pricing mechanism" analysis that was a pure preferentiality standard with no cost-recovery component at all.  Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) at 23-24.  After the Federal Circuit's holdings in *Nucor* and *POSCO*, the *Maverick Tube* opinion sustaining the *Welded Line Pipe* determination is no longer good law.

Hyundai Steel's argument also suggests that the legal rules and standards in Commerce's countervailing duty investigations and reviews should be treated as country-specific.  That is incorrect.  Commerce's determinations are arbitrary where they treat similar situations differently without adequate explanation.  *SKF*, 263 F.3d at 1382.  This applies equally to similar situations in different countries.  *See, e.g.*, *Nucor Corp. v United States*, No. 21-00182, slip op. 22-116 at 9-10, (Ct. Int'l Trade Oct. 5, 2022).  While the agency's application of consistent rules and standards may yield different outcomes based on case- or country-specific facts, Commerce may not apply different rules and standards to different countries to reach different outcomes in similar factual situations.

Hyundai Steel fails to identify a single example of Commerce applying the tier three legal framework at issue here in any context other than KEPCO's provision of electricity for less than adequate remuneration in Korea. Neither Defendant nor the GOK point to any examples either. Counsel for Nucor is likewise unaware of any. Commerce's only "well-established" practice under the tier three rule thus appears to be that it has no such practice and may make up rules and standards on a case-by-case, or country-by-country, basis to reach whatever outcome it desires. *See, e.g.*, *Cold-Rolled from Russia* IDM at 67.

At the very least, this counsels against deferring to the agency's interpretation of the rule. *See, e.g.*, *Kisor*, 139 S. Ct. at 2417-18 (requiring that "an agency's reading of a rule must reflect 'fair and considered judgment,'" such that "{w}e have . . . only rarely given *Auer* deference to an agency construction conflicting with a prior one"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years.").

## C.   The Final Results Were Unsupported by Substantial Evidence

In its Opening Brief, Nucor argued that the Final Results were unsupported by substantial evidence for two reasons. First, Commerce's conclusion that KEPCO's cost of acquiring electricity through the KPX was a market-based, cost-plus-profit price reflecting the fair value of electricity was unsubstantiated given the agency's failure to obtain actual cost data from the generators themselves or otherwise confirm the accuracy of the KPX's cost assignments. Nucor Br. at 18-22. Nucor pointed out that each element of the price at which KEPCO acquires electricity through the KPX is established by a GOK-controlled "Cost-Evaluation Committee" within the KPX and thus should not be accepted without confirmation that they reflect the actual costs of generation and supply. *Id.* at 21-22. Second, Nucor showed that, even based on KEPCO's costs

17

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

as reported, any conclusion that the prices paid by the respondents were cost-plus-profit prices was undermined by record evidence confirming that those prices were [

].  *Id.* at 22-24.

Defendant attempts to respond only to the first of these two arguments.  Def. Resp. Br. at 12-18.  In doing so, it largely recites the agency's findings and does not actually address Nucor's point.  *Id.*  For example, the mechanics of "KPX's standardized pricing system" as detailed by Defendant are largely irrelevant.  *Id.* at 16.  The issue is not what the elements of the "standardized pricing system" are intended to do in the GOK's telling.  The issue is whether that standardized pricing system in fact generates prices reflecting the true competitive-market value of the input, despite the GOK's control over every aspect of it.  *See POSCO*, 977 F.3d at 1377 (finding it "implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring electricity.").  Notwithstanding requests that it do so, Commerce did not attempt to collect information to confirm that the Cost Evaluation Committee's cost assignments did not distort KEPCO's cost data as reported by the GOK.  Letter from Cassidy Levy Kent, re: *Deficiency Comments Concerning the GOK's NSA SQR and Rebuttal Factual Information* (Mar. 16, 2021) at 12-13, C.R. 235, P.R. 141 ("U.S. Steel Comments").

The only suggestion that Commerce attempted to confirm as a quantitative matter that KEPCO's reported costs reflected the actual, undistorted cost of generation and supply is a single sentence in the preliminary decision memorandum: "In this instant case, the GOK provided financial statements for the {generation subsidiaries} and we continue to find preliminarily that each of {them} recovered its costs."  Prelim. Decision Memo at 35.  In the Final Results, Commerce provided only a qualitative description of the "KPX's standardized pricing system,"

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

which it concluded "is based on price-setting methodologies that <u>aim to ensure</u> companies in the chain <u>are able to</u> recover their costs, as well as a rate of profit."  Final Decision Memo at 17-18 (emphasis added).  There is no discussion in either the preliminary decision memorandum or the Final Results of how, exactly, Commerce determined from their "financial statements" (the GOK provided only balance sheets without the accompanying notes, Letter from Yoon & Yang, re: *New Subsidy Allegations Fourth Supplemental Questionnaire Response* (July 2, 2021) at Exhibit E-33, C.R. 255, P.R. 169 ("GOK NSA 4SQR")) that each of KEPCO's generation subsidiaries "recovered its costs."  The GOK suggests that the conclusion was based on an analysis of the generation companies' "financial position," GOK Resp. Br. at 26.  As demonstrated above, however, the overall "financial position" of a government supplier does not establish that its prices were market-based.

Only Defendant-Intervenors attempt to challenge Nucor's argument that Commerce's Final Results are undermined by the fact that the respondents' reported electricity prices were [                                        ].  Both take issue with comparing KEPCO's reported costs to the monthly, period-specific time-of-use prices that the respondents reported paying.  *Id.* at 29; Hyundai Steel Resp. Br. at 21.  According to the GOK, "Nucor focuses on the lowest off-peak and mid-peak prices, but then compares these prices to KEPCO's average costs for supplying electricity to all customers within the relevant {tariff} classification at all times of day for the entire year."  GOK Resp. Br. at 29.  The GOK suggests that the proper comparison would be between a single, annual unit value for the respondents' purchases and KEPCO's annual unit cost of supply. *Id.* at 30-31.[3]  Hyundai Steel likewise argues that Nucor "provides no legal basis or justification

---

[3]      It is unclear how the GOK arrived at its purported annual unit values, but it appears that it calculated a simple average of the monthly unit prices in Dongbu's questionnaire response, while

BUSINESS PROPRIETARY INFORMATION
                                                            HAS BEEN DELETED          NON-CONFIDENTIAL VERSION

for why Commerce is required to conduct a segmented time of use analysis rather than its normal

and established analysis of whether KEPCO recovered its costs for the overall industrial category

that is applicable to Hyundai Steel and Dongbu."  Hyundai Steel Resp. Br. at 21.

On these points, Defendant-Intervenors' problem is largely with Commerce and with the

GOK's own reporting, and not with Nucor.  In the Final Results, Commerce determined that the

annual cost data as reported by the GOK adequately reflected a cost-plus-profit price that it could

use as a benchmark.  Prelim. Decision Memo at 34-36.  It then used that <u>annual</u> data to derive a

second set of benchmarks, which it compared to the respondents <u>monthly, period-specific</u> time-of-

use prices.  *See* Commerce Memorandum, re: *Final Results Calculations for KG Dongbu Steel*

*Co., Ltd. and Dongbu Incheon Steel Co., Ltd.* (Jan 12, 2022) at Attachment 2 ([

] tab), C.R. 270-271, P.R. 214; Commerce Memorandum, re: *Final Results Calculations for*

*Hyundai Steel Company* (Jan. 12, 2022) at Attachment 2 ([                    ] and [

] tabs), C.R. 268-269, P.R. 212.  Nucor, in other words, presented the comparison in its

Opening Brief on a monthly, time-of-use specific basis using KEPCO's annual cost data and the

respondents' reported prices because <u>that is what Commerce did</u> in its own calculations.  No party

challenged this aspect of Commerce's determination, so it should not be reviewed here.  *See, e.g.*,

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F.Supp.3d 1313, 1337-38 (Ct. Int'l Trade

2020).

---

ignoring the volumes purchased at those respective prices. GOK Resp. Br. at 31.  That is a fictional
representation of what the respondent actually paid for electricity.  A calculation of the actual
annual weighted average unit price for [                                   ] yields [                        ],
which is <u>still</u> [                                                                                             ]
tariff classification.  *See*, Letter from Morris, Manning, and Martin LLP, re: *New Subsidy*
*Allegations Questionnaire Response* (Feb. 9, 2021) at Exhibit NSA-2, C.R. 212-216, P.R. 123;
Letter from Yoon & Yang, re: *New Subsidy Allegations Supplemental Questionnaire Response*
(Mar. 11, 2021) at Exhibit E-17.1, C.R. 232-233, P.R. 140.

Nucor nevertheless notes that using the respondents' reported monthly prices is consistent with Commerce's practice, while combining all prices paid by respondents into a single annual price would not be.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) at 41 ("*Softwood Lumber* IDM") (explaining that Commerce conducts the benchmark comparison "on the basis that is as close to a transaction-specific analysis as possible given the available record evidence," and that it does not determine an "overall benefit derived from all government sales of the good" because "a benefit is either conferred or not conferred; there is no such thing as a 'negative' benefit under the Act").

Finally, while petitioners requested more granular electricity cost data to confirm the GOK's assertions about variations in monthly or hourly cost of supply, *see* U.S. Steel Comments at 11-14, Commerce did not request that information, and the GOK did not provide it.  If the GOK had believed that seasonal or time-of-use specific cost data should have been used in any ultimate benchmark comparison, then it should have reported KEPCO's data in that manner.  Without any such data on the record, no evidence supports any assertions that there are meaningful variations in KEPCO's cost of supply based on seasonality or time of day.

Nucor has no control over either Commerce's requests for information or how respondents or foreign governments respond to those requests.  Given the GOK's decision to report only a single, annual value for KEPCO's cost of supply, "that is as close to a transaction-specific analysis as possible given the available record evidence."  *Softwood Lumber* IDM at 41 n.148.  The significance of purported seasonal or hourly variations in KEPCO's cost of supply were nevertheless not addressed by the agency itself, so the Court should decline to consider any related arguments by Defendant-Intervenors.  *See, e.g., Burlington Truck Lines, Inc. v. United States*, 371

Ct. No. 22-00050

NON-CONFIDENTIAL VERSION

U.S. 156, 168 (1962) ("{C}ourts may not accept appellate counsel's post hoc rationalizations for agency action.").

III.    **CONCLUSION**

For the reasons discussed above and in Nucor's Opening Brief, Nucor respectfully requests that the Court hold that Commerce's final results were unsupported by substantial evidence and otherwise not in accordance with law, and remand to Commerce for redetermination in accordance with the Court's opinion.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: November 4, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,712 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

November 4, 2022
(Date)